LEBRON *v.* NATIONAL RAILROAD PASSENGER
CORPORATION

No. 93–1525.   Argued November 7, 1994—Decided February 21, 1995

SCALIA, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. O'CONNOR, J., filed a dissenting opinion, *post,* p. 400.

*David D. Cole* argued the cause for petitioner. With him on the briefs were *R. Bruce Rich* and *Gloria C. Phares.*

*Kevin T. Baine* argued the cause for respondent. With him on the brief were *Nicole K. Seligman, Stephen C. Rogers,* and *Louis R. Cohen.**

JUSTICE SCALIA delivered the opinion of the Court.

In this case we consider whether actions of the National Railroad Passenger Corporation, commonly known as Amtrak, are subject to the constraints of the Constitution.

I

Petitioner, Michael A. Lebron, creates billboard displays that involve commentary on public issues, and that seemingly propel him into litigation. See, *e. g., Lebron* v. *Washington Metropolitan Area Transit Authority,* 749 F. 2d 893 (CADC 1984). In August 1991, he contacted Transportation Displays, Incorporated (TDI), which manages the leasing of the billboards in Amtrak's Pennsylvania Station in New York City, seeking to display an advertisement on a billboard of colossal proportions, known to New Yorkers (or at least to the more Damon Runyonesque among them) as "the Spectacular." The Spectacular is a curved, illuminated billboard, approximately 103 feet long and 10 feet high, which dominates the main entrance to Penn Station's waiting room and ticket area.

On November 30, 1992, Lebron signed a contract with TDI to display an advertisement on the Spectacular for two months beginning in January 1993. The contract provided that "[a]ll advertising copy is subject to approval of TDI and [Amtrak] as to character, text, illustration, design and operation." App. 671. Lebron declined to disclose the specific content of his advertisement throughout his negotiations

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union by *Stephen R. Shapiro, Marjorie Heins,* and *Arthur N. Eisenberg;* and for the NAACP Legal Defense and Educational Fund, Inc., et al. by *James F. Fitzpatrick, Elliot M. Mincberg,* and *Lawrence S. Ottinger.*

with TDI, although he did explain to TDI that it was generally political. On December 2, he submitted to TDI (and TDI later forwarded to Amtrak) an advertisement described by the District Court as follows:

> "The work is a photomontage, accompanied by considerable text. Taking off on a widely circulated Coors beer advertisement which proclaims Coors to be the 'Right Beer,' Lebron's piece is captioned 'Is it the Right's Beer Now?' It includes photographic images of convivial drinkers of Coors beer, juxtaposed with a Nicaraguan village scene in which peasants are menaced by a can of Coors that hurtles towards them, leaving behind a trail of fire, as if it were a missile. The accompanying text, appearing on either end of the montage, criticizes the Coors family for its support of right-wing causes, particularly the contras in Nicaragua. Again taking off on Coors' advertising which uses the slogan of 'Silver Bullet' for its beer cans, the text proclaims that Coors is 'The Silver Bullet that aims The Far Right's political agenda at the heart of America.'" 811 F. Supp. 993, 995 (SDNY 1993).

Amtrak's vice president disapproved the advertisement, invoking Amtrak's policy, inherited from its predecessor as landlord of Penn Station, the Pennsylvania Railroad Company, "that it will not allow political advertising on the [S]pectacular advertising sign." App. 285.

Lebron then filed suit against Amtrak and TDI, claiming, *inter alia*, that the refusal to place his advertisement on the Spectacular had violated his First and Fifth Amendment rights. After expedited discovery, the District Court ruled that Amtrak, because of its close ties to the Federal Government, was a Government actor, at least for First Amendment purposes, and that its rejection of Lebron's proposed advertisement as unsuitable for display in Penn Station had violated the First Amendment. The court granted Lebron an

injunction and ordered Amtrak and TDI to display Lebron's advertisement on the Spectacular.

The United States Court of Appeals for the Second Circuit reversed. 12 F. 3d 388 (1993). The panel's opinion first noted that Amtrak was, by the terms of the legislation that created it, not a Government entity, *id.*, at 390; and then concluded that the Federal Government was not so involved with Amtrak that the latter's decisions could be considered federal action, *id.*, at 391–392. Chief Judge Newman dissented. We granted certiorari. 511 U. S. 1105 (1994).

## II

We have held once, *Burton* v. *Wilmington Parking Authority*, 365 U. S. 715 (1961), and said many times, that actions of private entities can sometimes be regarded as governmental action for constitutional purposes. See, *e. g., San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.*, 483 U. S. 522, 546 (1987); *Blum* v. *Yaretsky*, 457 U. S. 991, 1004 (1982); *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163, 172 (1972). It is fair to say that "our cases deciding when private action might be deemed that of the state have not been a model of consistency." *Edmonson* v. *Leesville Concrete Co.*, 500 U. S. 614, 632 (1991) (O'CONNOR, J., dissenting). It may be unnecessary to traverse that difficult terrain in the present case, since Lebron's first argument is that Amtrak is not a private entity but Government itself. Before turning to the merits of this argument, however, it is necessary to discuss the propriety of reaching it. Lebron did not raise this point below; indeed, he expressly disavowed it in both the District Court and the Court of Appeals. See Plaintiff's Pre-Trial Proposed Conclusions of Law in No. 92–CIV–9411 (SDNY), p. 12, n. 1, reprinted in App. in No. 93–7127 (CA2), p. 1297; Brief for Appellee in No. 93–7127 (CA2), p. 30, n. 39. In those courts Lebron argued that Amtrak's actions were subject to constitutional requirements because Amtrak, *al-*

*though a private entity,* was closely connected with federal entities. It was not until after we granted certiorari that Lebron first explicitly presented—in his brief on the merits—the alternative argument that Amtrak was itself a federal entity.

Our traditional rule is that "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Yee* v. *Escondido,* 503 U. S. 519, 534 (1992); see also *Dewey* v. *Des Moines,* 173 U. S. 193, 198 (1899). Lebron's contention that Amtrak is part of the Government is in our view not a new claim within the meaning of that rule, but a new argument to support what has been his consistent claim: that Amtrak did not accord him the rights it was obliged to provide by the First Amendment. Cf. *Yee, supra,* at 534–535. In fact, even if this *were* a claim not raised by petitioner below, we would ordinarily feel free to address it, since it was addressed by the court below. Our practice "permit[s] review of an issue not pressed so long as it has been passed upon . . . ." *United States* v. *Williams,* 504 U. S. 36, 41 (1992). See *Virginia Bankshares, Inc.* v. *Sandberg,* 501 U. S. 1083, 1099, n. 8 (1991); *Stevens* v. *Department of Treasury,* 500 U. S. 1, 8 (1991).

Respondent asserts that, in addition to not having been raised below, the issue of whether Amtrak is a Government entity was not presented in the petition for certiorari. As this Court's Rule 14.1(a) and simple prudence dictate, we will not reach questions not fairly included in the petition. "The Court decides which questions to consider through well-established procedures; allowing the able counsel who argue before us to alter these questions or to devise additional questions at the last minute would thwart this system." *Taylor* v. *Freeland & Kronz,* 503 U. S. 638, 646 (1992). Here, however, we are satisfied that the argument that Amtrak is a Government entity is fairly embraced within the question

set forth in the petition for certiorari[1]—which explicitly presents *neither* the "Government entity" theory *nor* the "closely connected to Government" theory of First Amendment application, but rather the facts that would support both. The argument in the petition, moreover, though couched in terms of a different but closely related theory, fairly embraced the argument that Lebron now advances. See Pet. for Cert. 16–18.

The dissent contends that the "Government entity" question in the present case occupies the same status, insofar as Rule 14.1(a) is concerned, as the "physical taking" question which we deemed excluded in *Yee* v. *Escondido, supra.* It gives two reasons for that equivalence: First, the fact that Lebron prefaced his question presented by the phrase, "Whether the court of appeals erred in holding." App. to Pet. for Cert. i. The dissent asserts that this is similar to the preface in *Yee*, which had the effect of limiting the question to the precise ground relied upon by the Court of Appeal. *Post*, at 402. But the preface in *Yee* was not at all similar. What we said caused the question presented to be limited to the physical-taking issue was *not* the fact that that was the only ground addressed by the lower-court-said-to-be-in-error; but rather the fact that that was the only ground of decision in two previous Court of Appeals cases, *departure*

---

[1] Certiorari was sought and granted in this case on the following question:

"Whether the court of appeals erred in holding that Amtrak's asserted policy barring the display of political advertising messages in Pennsylvania Station, New York, was not state action, where:

"(a) the United States created Amtrak, endowed it with governmental powers, owns all its voting stock, and appoints all members of its Board;

"(b) the United States-appointed Board approved the advertising policy challenged here;

"(c) the United States keeps Amtrak afloat every year by subsidizing its losses; and

"(d) Pennsylvania Station was purchased for Amtrak by the United States and is shared with several other governmental entities."

*from which was said by the question presented to be the issue in the appeal.*[2]   503 U. S., at 536–537.

The dissent's second reason for believing that *Yee* governs the Rule 14.1(a) issue here is that the structural relationship between the clearly presented question and the assertedly included question in the two cases is the same.   As the dissent correctly analyzes *Yee,* it involved one "umbrella claim" (government taking of property without just compensation) and "two distinct questions" that were "[s]ubsidiary to that claim" (whether a physical taking had occurred, and whether a regulatory taking had occurred).   *Post,* at 401.   But the questions in *Yee* were "distinct" in two important ways that the claims here are not.   First of all, it was possible to consider the existence of a physical taking without *assuming* (as one of the premises of the inquiry) the *nonexistence* of a regulatory taking; whereas here it is quite impossible to consider whether the Government connections are sufficient to convert private-entity Amtrak into a Government actor without first assuming that Amtrak is a private entity.   The opinion in *Yee* did not have to begin: "Assuming that no regulatory taking has occurred, . . . ."   But the portion of today's dissent addressing the merits of this case must begin: "Accepting Lebron's concession that Amtrak is a private entity, . . . ."   *Post,* at 408.   The question of private-entity status is, in other words, a *prior* question.   The second respect in which the issues here are less "distinct" than in *Yee* is that the factors relevant to their resolution overlap. In *Yee,* what would go to show a regulatory taking and

---

[2] The question presented in *Yee* read as follows:

" 'Two federal courts of appeal have held that the transfer of a premium value to a departing mobilehome tenant, representing the value of the right to occupy at a reduced rate under local mobilehome rent control ordinances, constitute[s] an impermissible taking.   Was it error for the state appellate court to disregard the rulings and hold that there was no taking under the fifth and fourteenth amendments?' "   503 U. S., at 536–537.

what would go to show a physical taking were quite different. Here, however, those very elements that we would be considering in determining whether Amtrak-the-private-entity is so closely connected with the Government as to be a Government actor (for example, the constitution of its board) also bear upon whether it is *in fact* a private entity at all. When a question is, like this one, both prior to the clearly presented question and dependent upon many of the same factual inquiries, refusing to regard it as embraced within the petition may force us to assume what the facts will show to be ridiculous, a risk that ought to be avoided.

The recent decision of ours that invites comparison with the dissent's insistence that the "Government entity" question is "precluded," *post,* at 400, is not *Yee,* but *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.,* 508 U. S. 439 (1993). There, in a case raising the question of the proper interpretation of 12 U. S. C. § 92 (1926 ed.), we upheld the propriety of the Court of Appeals' considering the prior question whether 12 U. S. C. § 92 had been inadvertently repealed—even though the parties themselves had failed to raise that question, not only (as here) in the court below, but even in the initial briefs and oral arguments before the Court of Appeals itself. That is to say, the situation there, at the court of appeals level, was what the situation *would be* before us here, if (1) the dissent were correct that Rule 14.1(a) was not complied with, and (2) in addition, even the petitioner's *principal brief and oral argument* had failed to raise the "Government entity" issue. Even so, we held in *Independent Insurance Agents* that it was proper for the Court of Appeals to request supplemental briefing upon, and to decide, the statutory repeal question, and we then went on to inquire into that question ourselves. Our opinion was unanimous, not a single Justice protesting that the judges of the Court of Appeals, or of this Court, had constituted

themselves "'as [a] self-directed boar[d] of legal inquiry'" or had "exhibit[ed] little patience," *post*, at 408.[3]

## III

Before proceeding to consider Lebron's contention that Amtrak, though nominally a private corporation, must be regarded as a Government entity for First Amendment purposes, we examine the nature and history of Amtrak and of Government-created corporations in general.

## A

Congress established Amtrak in order to avert the threatened extinction of passenger trains in the United States.

---

[3] The dissent sees no more in *Independent Ins. Agents* than a narrow holding that the Court of Appeals' decision to reach the statutory repeal issue was not *so* imprudent as to be reversible for abuse of discretion. Even that is a damaging concession, given the dissent's apparent position that allowing a litigant "to resuscitate [a] claim that he himself put to rest" always violates "prudential" rules. *Post*, at 406. But in fact the language of the *Independent Ins. Agents* opinion is much more approving of the Court of Appeals' action than that. It declines even to brush aside the Court of Appeals' (questionable) contention that there was "a 'duty' to address the status of section 92," saying only that "[w]e need not decide" that question. 508 U. S., at 448. And it goes on to state that the Court of Appeals acted "without *any* impropriety," and that its decision to consider the issue was "*certainly* no abuse of its discretion." *Ibid.* (emphasis added). If we had not thought that the Court of Appeals' entertainment of the statutory repeal question was, not merely unreversible, but appropriate, we would not have rendered ourselves complicit in the enterprise by exercising our own discretion to grant certiorari on that question. (There was no particular need to intervene, since the Court of Appeals had upheld the law.)

The dissent also seeks to characterize *Independent Ins. Agents* as no more than an application of "the traditional principle that there can be no estoppel in the way of ascertaining the existence of a law." *Post*, at 404 (internal quotation marks omitted). It was indeed an application of that principle insofar as concerned the claim that the appellants' right to assert repeal of the statute had been forfeited. But forfeit was not the only point decided in the case: not every nonforfeited claim merits consideration on appeal.

The statute that created it begins with the congressional finding, redolent of provisions of the Interstate Commerce Act, see, *e. g.*, 49 U. S. C. §§ 10901, 10903, 10922 (1988 ed. and Supp. V), that "the *public convenience and necessity* require the continuance and improvement" of railroad passenger service. Rail Passenger Service Act of 1970 (RPSA), § 101, 84 Stat. 1328 (emphasis added). In the current version of the RPSA, 45 U. S. C. § 501 *et seq.* (1988 ed. and Supp. V), the congressional findings are followed by a section entitled "Goals," which begins, "The Congress hereby establishes the following goals for Amtrak," and includes items of such detail as the following:

> "(3) Improvement of the number of passenger miles generated systemwide per dollar of Federal funding by at least 30 percent within the two-year period beginning on October 1, 1981.
>
> "(4) Elimination of the deficit associated with food and beverage services by September 30, 1982.
>
> .  .  .  .  .
>
> "(6) Operation of Amtrak trains, to the maximum extent feasible, to all station stops within 15 minutes of the time established in public timetables for such operation.
>
> .  .  .  .  .
>
> "(8) Implementation of schedules which provide a systemwide average speed of at least 60 miles per hour . . . ." § 501a.

Later sections of the statute authorize Amtrak's incorporation, §§ 541–542, set forth its structure and powers, §§ 543–545, and outline procedures under which Amtrak will relieve private railroads of their passenger-service obligations and provide intercity and commuter rail passenger service itself, §§ 561–566. See generally *National Railroad Passenger Corporation* v. *Atchison, T. & S. F. R. Co.*, 470 U. S. 451, 453–456 (1985). As initially conceived, Amtrak was to be

"a for profit corporation," 84 Stat. 1330, but Congress later modified this language to provide, less optimistically perhaps, that Amtrak "shall be operated and managed as a for profit corporation," § 541.

Amtrak is incorporated under the District of Columbia Business Corporation Act, D. C. Code Ann. § 29–301 *et seq.* (1981 and Supp. 1994), but is subject to the provisions of that Act only insofar as the RPSA does not provide to the contrary, see § 541. It does provide to the contrary with respect to many matters of structure and power, including the manner of selecting the company's board of directors. The RPSA provides for a board of nine members, six of whom are appointed directly by the President of the United States. The Secretary of Transportation, or his designee, sits ex officio. § 543(a)(1)(A). The President appoints three more directors with the advice and consent of the Senate, § 543(a)(1)(C), selecting one from a list of individuals recommended by the Railway Labor Executives Association, § 543(a)(1)(C)(i), one "from among the Governors of States with an interest in rail transportation," § 543(a)(1)(C)(ii), and one as a "representative of business with an interest in rail transportation," § 543(a)(1)(C)(iii). These directors serve 4-year terms. § 543(a)(2)(A). The President appoints two additional directors without the involvement of the Senate, choosing them from a list of names submitted by various commuter rail authorities. § 543(a)(1)(D). These directors serve 2-year terms. § 543(a)(2)(B). The holders of Amtrak's preferred stock select two more directors, who serve 1-year terms. § 543(a)(1)(E). Since the United States presently holds all of Amtrak's preferred stock, which it received (and still receives) in exchange for its subsidization of Amtrak's perennial losses, see § 544(c), the Secretary of Transportation selects these two directors. The ninth member of the board is Amtrak's president, § 543(a)(1)(B), who serves as the chairman of the board, § 543(a)(4), is selected by the other eight directors, and serves at their pleasure, § 543(d).

Amtrak's four private shareholders have not been entitled to vote in selecting the board of directors since 1981.[4]

By § 548 of the RPSA, Amtrak is required to submit three different annual reports to the President and Congress. One of these, a "report on the effectiveness of this chapter in meeting the requirements for a balanced national transportation system, together with any legislative recommendations," is made part of the Department of Transportation's annual report to Congress. § 548(c).

## B

Amtrak is not a unique, or indeed even a particularly unusual, phenomenon. In considering the question before us, it is useful to place Amtrak within its proper context in the long history of corporations created and participated in by the United States for the achievement of governmental objectives.

The first was the Bank of the United States, created by the Act of Feb. 25, 1791, ch. 10, 1 Stat. 191, which authorized the United States to subscribe 20 percent of the corporation's stock, *id.*, at 196. That Bank expired pursuant to the terms of its authorizing Act 20 years later. A second Bank of the United States, the bank of *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), and *Osborn* v. *Bank of United States*, 9 Wheat. 738 (1824), was incorporated by the Act of April 10, 1816, 3

---

[4] Originally, Amtrak's board comprised 15 directors: 7 selected by the shareholders and 8 (one of whom had to be the Secretary of Transportation) appointed by the President of the United States. See RPSA §§ 303(a) and (c), 84 Stat. 1330–1331. In 1973, Congress increased the number of directors to 17, the number of Presidential appointees to 9, and made the Secretary of Transportation a director ex officio. See Amtrak Improvement Act of 1973, § 3(a), 87 Stat. 548. In 1976, the number of Presidential appointees (apart from the Secretary of Transportation) was reduced to eight and Amtrak's president made a director ex officio. See Rail Transportation Improvement Act, § 103, 90 Stat. 2615. Amtrak's board was given its current size and membership in 1981. See Omnibus Budget Reconciliation Act of 1981, § 1174, 95 Stat. 689.

Stat. 266, which provided that the United States would subscribe 20 percent of the Bank's capital stock, *ibid.*, and in addition that the President would appoint, by and with the advice and consent of the Senate, 5 of the Bank's 25 directors, the rest to be elected annually by shareholders other than the United States, *id.*, at 269.

The second Bank's charter expired of its own force, despite fierce efforts by the Bank's supporters to renew it, in 1836. See generally R. Remini, Andrew Jackson and the Bank War 155–175 (1967). During the remainder of the 19th century, the Federal Government continued to charter private corporations, see, *e. g.*, Act of July 2, 1864, 13 Stat. 365 (Northern Pacific Railroad Company), but only once participated in such a venture itself: the Union Pacific Railroad, chartered in 1862 with the specification that two of its directors would be appointed by the President of the United States. Act of July 1, 1862, § 1, 12 Stat. 491. See F. Leazes, Jr., Accountability and the Business State 117, n. 8 (1987) (hereinafter Leazes).

The Federal Government's first participation in a corporate enterprise in which (as with Amtrak) it appointed a majority of the directors did not occur until the present century. In 1902, to facilitate construction of the Panama Canal, Congress authorized the President to purchase the assets of the New Panama Canal Company of France, including that company's stock holdings in the Panama Railroad Company, a private corporation chartered in 1849 by the State of New York. See Act of June 28, 1902, 32 Stat. 481; see also General Accounting Office, Reference Manual of Government Corporations, S. Doc. No. 86, 79th Cong., 1st Sess., 176 (1945) (hereinafter GAO Corporation Manual). The United States became the sole shareholder of the Panama Railroad, and continued to operate it under its original charter, with the Secretary of War, as the holder of the stock, electing the Railroad's 13 directors. *Id.*, at 177; Joint Committee on Reduction of Nonessential Federal Expenditures, Reduction of Nonessential Federal Expenditures, S. Doc. No. 227,

78th Cong., 2d Sess., 20 (1944) (hereinafter Reduction of Expenditures).

The first large-scale use of Government-controlled corporations came with the First World War. In 1917 and 1918, Congress created, among others, the United States Grain Corporation, the United States Emergency Fleet Corporation, the United States Spruce Production Corporation, and the War Finance Corporation. See Leazes 20. These entities were dissolved after the war ended. See Reduction of Expenditures 1.

The Great Depression brought the next major group of Government corporations, which proved to be more enduring. These were primarily directed to stabilizing the economy and to making distress loans to farms, homeowners, banks, and other enterprises. See R. Moe, CRS Report for Congress, Administering Public Functions at the Margins of Government: The Case of Federal Corporations 6–7 (1983). The Reconstruction Finance Corporation (RFC), to take the premier example, was initially authorized to make loans to banks, insurance companies, railroads, land banks, and agricultural credit organizations, including loans secured by the assets of failed banks. See Act of Jan. 22, 1932, § 5, 47 Stat. 6–7. The Federal Deposit Insurance Corporation (FDIC), was established to hold and liquidate the assets of failed banks, and to insure bank deposits. See Act of June 16, 1933, ch. 89, § 8, 48 Stat. 168, as amended, 12 U. S. C. § 1811 *et seq.* (1988 ed. and Supp. V). And a few corporations, such as the Tennessee Valley Authority (TVA), brought the Government into the commercial sale of goods and services. See Act of May 18, 1933, ch. 32, 48 Stat. 58, as amended, 16 U. S. C. § 831 *et seq.* (1988 ed. and Supp. V).

The growth of federal corporations during the Depression and the World War II era was not limited to the numerous entities specifically approved by Congress. In 1940, Congress empowered the RFC to create corporations without specific congressional authorization. See Act of June 25,

1940, §5, 54 Stat. 573–574. The RFC proceeded to do so with gusto, incorporating on its own the Defense Plant Corporation, the Defense Supplies Corporation, the Metals Reserve Company (which itself created several subsidiaries), the Petroleum Reserves Corporation, the Rubber Development Corporation, and the War Damage Corporation, among others. See GAO Corporation Manual 32, 38, 169, 182, 219, 279. Other corporations were formed, sometimes under state law, without even the general congressional authorization granted the RFC. For example, the Defense Homes Corporation was organized under Maryland law by the Secretary of the Treasury, using emergency funds allocated to the President, *id.*, at 28 ("It is not clear what, if any, specific Federal statutory authority was relied upon for the creation of the Defense Homes Corporation"); and the Tennessee Valley Associated Cooperatives, Inc., was chartered under Tennessee law by the TVA, *id.*, at 244 ("There has been found no Federal statute specifically authorizing the Board of Directors of the Tennessee Valley Authority to organize a corporation"). By 1945, the General Accounting Office's Reference Manual of Government Corporations listed 58 government corporations, with total assets (in 1945 dollars) of $29.6 billion. See *id.*, at iii, v–vi.

By the end of World War II, Government-created and -controlled corporations had gotten out of hand, in both their number and their lack of accountability. Congress moved to reestablish order in the Government Corporation Control Act (GCCA), 59 Stat. 597, as amended, 31 U. S. C. §9101 *et seq.* (1988 ed. and Supp. V). See Pritchett, The Government Corporation Control Act of 1945, 40 Am. Pol. Sci. Rev. 495 (1946). The GCCA required that specified corporations, both wholly owned and partially owned by the Government, be audited by the Comptroller General. See 59 Stat. 599, 600. Additionally, the wholly owned corporations were required, for the first time, to submit budgets which would be included in the budget submitted annually to Congress by

the President. *Id.*, at 598; see also Leazes 22–23. The GCCA also ordered the dissolution or liquidation of all government corporations created under state law, except for those that Congress should act to reincorporate; and prohibited creation of new Government corporations without specific congressional authorization. 59 Stat. 602; cf. 31 U. S. C. § 9102.

Thus, in the years immediately following World War II, many Government corporations were dissolved, and to our knowledge only one, the Saint Lawrence Seaway Development Corporation, was created. See Leazes 25, 27. In the 1960's, however, the allure of the corporate form was felt again, and new entities proliferated. Many of them followed the traditional model, often explicitly designated as Government agencies and located within the existing Government structure. See, *e. g.*, Foreign Assistance Act of 1969, § 105, 83 Stat. 809 (creating the Overseas Private Investment Corporation as "an agency of the United States under the policy guidance of the Secretary of State"), as amended, 22 U. S. C. § 2191 *et seq.* (1988 ed. and Supp. V). Beginning in 1962, however, the Government turned to sponsoring corporations that it specifically designated *not* to be agencies or establishments of the United States Government, and declined to subject to the control mechanisms of the GCCA. The first of these, the Communications Satellite Corporation (Comsat), was incorporated under the District of Columbia Business Corporation Act, D. C. Code Ann. § 29–301 *et seq.* (1981 and Supp. 1994), see 47 U. S. C. § 731 *et seq.*, with the purpose of entering the private sector, but doing so with Government-conferred advantages, see Moe, *supra*, at 22. Comsat was capitalized entirely with private funds. See Seidman, Government-sponsored Enterprise in the United States, in The New Political Economy: The Public Use of the Private Sector 92 (B. Smith ed. 1975). In contrast to the corporations that had in the past been deemed part of the Government, Comsat's board was to be controlled by its private

shareholders; only 3 of its 15 directors were appointed by the President, § 733(a).

The Comsat model, which was seen as allowing the Government to act unhindered by the restraints of bureaucracy and politics, see Moe, CRS Report, at 22, 24, was soon followed in creating other corporations. But some of these new "private" corporations, though said by their charters not to be agencies or instrumentalities of the Government, see, e. g., 47 U. S. C. § 396(b) (Corporation for Public Broadcasting (CPB)); 42 U. S. C. § 2996d(e)(1) (Legal Services Corporation (LSC)), and though not subjected to the restrictions of the GCCA, were (unlike Comsat) managed by boards of directors on which Government appointees had not just a few votes but voting control. See Public Broadcasting Act of 1967, § 201, 81 Stat. 369 (CPB's entire board appointed by President); Legal Services Corporation Act of 1974, § 2, 88 Stat. 379 (same for LSC).

Amtrak is yet another variation upon the Comsat theme. Like Comsat, CPB, and LSC, its authorizing statute declares that it "will not be an agency or establishment of the United States Government." 84 Stat. 1330; see 45 U. S. C. § 541. Unlike Comsat, but like CPB and LSC, its board of directors is controlled by Government appointees. And unlike all three of those "private" corporations, it *has* been added to the list of corporations covered by the GCCA, see 31 U. S. C. § 9101 (1988 ed. and Supp. V). As one perceptive observer has concluded with regard to the post-Comsat Government-sponsored "private" enterprises:

"There is no valid basis for distinguishing between many government-sponsored enterprises and other types of government activities, except for the fact that they are designed [designated?] by law as 'not an agency and instrumentality of the United States Government.' Comparable powers and immunities could be granted to such agencies without characterizing them as non-government." Seidman, *supra,* at 93.

## IV

Amtrak claims that, whatever its relationship with the Federal Government, its charter's disclaimer of agency status prevents it from being considered a Government entity in the present case. This reliance on the statute is misplaced. Section 541 is assuredly dispositive of Amtrak's status as a Government entity for purposes of matters that are within Congress's control—for example, whether it is subject to statutes that impose obligations or confer powers upon Government entities, such as the Administrative Procedure Act, 5 U. S. C. § 551 *et seq.* (1988 ed. and Supp. V), the Federal Advisory Committee Act, 5 U. S. C. App. § 1 *et seq.*, and the laws governing Government procurement, see 41 U. S. C. § 5 *et seq.* (1988 ed. and Supp. V). And even beyond that, we think § 541 can suffice to deprive Amtrak of all those inherent powers and immunities of Government agencies that it is within the power of Congress to eliminate. We have no doubt, for example, that the statutory disavowal of Amtrak's agency status deprives Amtrak of sovereign immunity from suit, see *Sentner* v. *Amtrak*, 540 F. Supp. 557, 560 (NJ 1982), and of the ordinarily presumed power of Government agencies authorized to incur obligations to pledge the credit of the United States, see, *e. g.*, *Debt Obligations of Nat. Credit Union Admin.*, 6 Op. Off. Legal Counsel 262, 264 (1982). But it is not for Congress to make the final determination of Amtrak's status as a Government entity for purposes of determining the constitutional rights of citizens affected by its actions. If Amtrak is, by its very nature, what the Constitution regards as the Government, congressional pronouncement that it is not such can no more relieve it of its First Amendment restrictions than a similar pronouncement could exempt the Federal Bureau of Investigation from the Fourth Amendment. The Constitution constrains governmental action "by whatever instruments or in whatever modes that action may be taken." *Ex parte Virginia*, 100 U. S. 339, 346–347 (1880). And under whatever congres-

sional label. As we said of the Reconstruction Finance Corporation in deciding whether debts owed it were owed the United States Government: "That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is . . . ." *Cherry Cotton Mills, Inc.* v. *United States,* 327 U. S. 536, 539 (1946).

Amtrak points to two of our opinions that characterize Amtrak as a nongovernmental entity. The first is *National Railroad Passenger Corporation* v. *Boston & Maine Corp.,* 503 U. S. 407, 410 (1992), which describes the corporation as "not an agency or instrumentality of the United States Government." But the governmental or nongovernmental nature of Amtrak had no conceivable relevance to the issues before the Court in *Boston & Maine.* The quoted characterization, similar to that contained in the statute, was merely set forth at the beginning of the opinion, in describing the factual background of the case. It is hard to imagine weaker dictum.

The second case is *National Railroad Passenger Corporation* v. *Atchison, T. & S. F. R. Co.,* 470 U. S. 451 (1985). There the governmental character of Amtrak *was* marginally relevant. The railroads opposing Amtrak in the case argued that a subsequent statute reneging on the Government's *own* obligations was subject to a "more rigorous standard of review" under the Due Process Clause than a statute impairing private contractual obligations. *Id.,* at 471. The Court said it did not have to consider that question because the contracts in question were "not between the railroads and the United States but simply between the railroads and the nongovernmental corporation, Amtrak." *Id.,* at 470. But it develops, later in the opinion, that the Court would not have had to consider that question anyway, since it concluded that the contracts (whether those of the United States or not) did not incur the obligation alleged. The effect of the apparent reliance upon Amtrak's nongov-

ernmental character was *at most* to enable the Court to make, later in the opinion, without applying the "more rigorous standard" urged by the railroads, the superfluous argument that "[e]ven were the Court of Appeals correct that the railroads have a private contractual right . . . we disagree with the Court of Appeals' conclusion that the Due Process Clause limited Congress' power to [affect that right as it did]." *Id.*, at 476. Moreover, for the purpose at hand in *Atchison* it was quite proper for the Court to treat Congress's assertion of Amtrak's nongovernmental status in § 541 as conclusive. As we have suggested above, even if Amtrak *is* a Government entity, § 541's disavowal of that status certainly suffices to disable that agency from incurring contractual obligations on behalf of the United States. For these reasons, we think that *Atchison*'s assumption of Amtrak's nongovernmental status (a point uncontested by the parties in the case, since it was not Amtrak's governmental character that the railroads relied upon to establish an obligation of the United States) does not bind us here.

V

The question before us today is unanswered, therefore, by governing statutory text or by binding precedent of this Court. Facing the question of Amtrak's status for the first time, we conclude that it is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution.

This conclusion seems to us in accord with public and judicial understanding of the nature of Government-created and -controlled corporations over the years. A remarkable feature of the heyday of those corporations, in the 1930's and 1940's, was that, even while they were praised for their status "as agencies separate and distinct, administratively and financially and legally, from the government itself, [which] has facilitated their adoption of commercial methods of accounting and financing, avoidance of political controls, and

utilization of regular procedures of business management," it was fully acknowledged that they were a "device" of "government," and constituted "federal corporate agencies" apart from "regular government departments." Pritchett, 40 Am. Pol. Sci. Rev., at 495. The Reference Manual of Government Corporations, prepared in 1945 by the Comptroller General, contains as one of its Tables "Corporations arranged according to supervising or interested Government department or agency," see GAO Corporation Manual x–xi. This lists the 58 then-extant Government corporations under the various departments and agencies, from the Agriculture Department to the War Department, and then concludes the list with five "Independent corporations"—analogous, one supposes, to the "independent agencies" of the Executive Branch proper. The whole tenor of the Manual is that these corporations are part of the Government.

This Court has shared that view. For example, in *Reconstruction Finance Corporation* v. *J. G. Menihan Corp.*, 312 U. S. 81 (1941), Chief Justice Hughes, writing for the Court, described the RFC, whose organic statute did not state it to be a Government instrumentality, as, nonetheless, "a corporate agency of the government," and said that "it acts as a governmental agency in performing its functions." *Id.*, at 83. In *Cherry Cotton Mills, Inc.* v. *United States*, 327 U. S. 536 (1946), we had little difficulty finding that the RFC was "an agency selected by Government to accomplish purely governmental purposes," *id.*, at 539, and was thus entitled to the benefit of a statute giving the Court of Claims jurisdiction over "counterclaims . . . on the part of the Government of the United States," 28 U. S. C. § 250(2) (1940 ed.). Likewise in *Inland Waterways Corp.* v. *Young*, 309 U. S. 517 (1940), we found that the Inland Waterways Corporation, which similarly was not specifically designated in its charter as an instrumentality of the United States, see Act of June 3, 1924, 43 Stat. 360, was an agency of the United States, so that its funds were "public moneys" for which national banks

could give security under § 45 of the National Bank Act of 1864, 13 Stat. 113, 309 U. S., at 523–524. Justice Frankfurter wrote for the Court:

"So far as the powers of a national bank to pledge its assets are concerned, the form which Government takes—whether it appears as the Secretary of the Treasury, the Secretary of War, or the Inland Waterways Corporation—is wholly immaterial. The motives which lead Government to clothe its activities in corporate form are entirely unrelated to the problem of safeguarding governmental deposits . . . ." *Id.*, at 523.

Even Congress itself appeared to acknowledge, at least until recent years, that Government-created and -controlled corporations were part of the Government. The GCCA, discussed above, which brought to an end the era of uncontrolled growth of Government corporations, provided that, without explicit congressional authorization, no corporation should be acquired or created by "any officer or agency of the Federal Government or by any Government corporation *for the purpose of acting as an agency or instrumentality of the United States* . . . ." § 304(a), 59 Stat. 602 (emphasis added). That was evidently intended to restrict the creation of *all* Government-controlled policy-implementing corporations, and not just some of them. And the companion provision that swept away many of the extant corporations said that no wholly owned government corporation created under state law could continue "as an agency or instrumentality of the United States," § 304(b), 59 Stat. 602. Once again, that was evidently meant to eliminate policy-implementing government ownership of *all* state corporations, and not just some of them. From the 1930's onward, many of the statutes creating Government-controlled corporations said explicitly that they were agencies or instrumentalities of the United States, see, *e. g.*, Act of June 9, 1947, § 1, 61 Stat. 130, as amended, 12 U. S. C. § 635 (creating the

Export-Import Bank of Washington as "an agency of the United States of America"); Federal Crop Insurance Act, § 503, 52 Stat. 72, 7 U. S. C. § 1503 (creating Federal Crop Insurance Corporation as "an agency of and within the Department of Agriculture"), and until 1962 none said otherwise. As we have described above, moreover, those later statutes, relatively few in number, took that statement, perhaps too uncritically, from an earlier statute pertaining to a corporation (Comsat) that was *genuinely* private and *not* Government controlled.

That Government-created and -controlled corporations are (for many purposes at least) part of the Government itself has a strong basis, not merely in past practice and understanding, but in reason itself. It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form. On that thesis, *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), can be resurrected by the simple device of having the State of Louisiana operate segregated trains through a state-owned Amtrak. In *Pennsylvania* v. *Board of Directors of City Trusts of Philadelphia*, 353 U. S. 230 (1957) *(per curiam)*, we held that Girard College, which had been built and maintained pursuant to a privately erected trust, was nevertheless a governmental actor for constitutional purposes because it was operated and controlled by a board of state appointees, which was itself a state agency. *Id.*, at 231. Amtrak seems to us an *a fortiori* case.

Amtrak was created by a special statute, explicitly for the furtherance of federal governmental goals. As we have described, six of the corporation's eight externally named directors (the ninth is named by a majority of the board itself) are appointed directly by the President of the United States—four of them (including the Secretary of Transportation) with the advice and consent of the Senate. See §§ 543(a)(1)(A), (C)–(D). Although the statute restricts most of the President's choices to persons suggested by certain

organizations or persons having certain qualifications, those restrictions have been tailor-made by Congress for this entity alone. They do not in our view establish an absence of control by the Government as a whole, but rather constitute a restriction imposed by one of the political branches upon the other. Moreover, Amtrak is not merely in the temporary control of the Government (as a private corporation whose stock comes into federal ownership might be); it is established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees. It is in that respect no different from the so-called independent regulatory agencies such as the Federal Communications Commission or the Securities Exchange Commission, which are run by Presidential appointees with fixed terms. It is true that the directors of Amtrak, unlike commissioners of independent regulatory agencies, are not, by the explicit terms of the statute, removable by the President for cause, and are not impeachable by Congress. But any reduction in the immediacy of accountability for Amtrak directors vis-à-vis regulatory commissioners seems to us of minor consequence for present purposes—especially since, by the very terms of the chartering Act, Congress's "right to repeal, alter, or amend this chapter at any time is expressly reserved." 45 U. S. C. § 541.

Respondent appeals to statements this Court made in a case involving the second Bank of the United States, *Bank of United States* v. *Planters' Bank of Georgia*, 9 Wheat. 904 (1824). There we allowed the Planters' Bank, in which the State of Georgia held a noncontrolling interest, see Act of Dec. 19, 1810, § 1, reprinted in Digest of Laws of State of Georgia 34–35 (O. Prince ed. 1822); Act of Dec. 3, 1811, § 1, *id.*, at 35, to be sued in federal court despite the Eleventh Amendment, reasoning that "[t]he State does not, by becoming a corporator, identify itself with the corporation," 9 Wheat., at 907. "The government of the Union," we said,

"held shares in the old Bank of the United States; but the privileges of the government were not imparted by that circumstance to the bank. The United States was not a party to suits brought by or against the bank in the sense of the constitution." *Id.*, at 908. But it does not contradict those statements to hold that a corporation is an agency of the Government, for purposes of the constitutional obligations of Government rather than the "privileges of the government," when the State has specifically created that corporation for the furtherance of governmental objectives, and not merely holds some shares but controls the operation of the corporation through its appointees.

Respondent also invokes our decision in the *Regional Rail Reorganization Act Cases*, 419 U. S. 102 (1974), which found the Consolidated Rail Corporation, or Conrail, not to be a federal instrumentality, despite the President's power to appoint, directly or indirectly, 8 of its 15 directors. See *id.*, at 152, n. 40; Regional Rail Reorganization Act of 1973, §301, 87 Stat. 1004. But we specifically observed in that case that the directors were placed on the board to protect the United States' interest "in assuring payment of the obligations guaranteed by the United States," and that "[f]ull voting control . . . will shift to the shareholders if federal obligations fall below 50% of Conrail's indebtedness." 419 U. S., at 152. Moreover, we noted, "[t]he responsibilities of the federal directors are not different from those of the other directors— to operate Conrail at a profit for the benefit of its shareholders," *ibid.*—which contrasts with the public interest "goals" set forth in Amtrak's charter, see 45 U. S. C. §501a. Amtrak is worlds apart from Conrail: The Government exerts its control not as a creditor but as a policymaker, and no provision exists that will automatically terminate control upon termination of a temporary financial interest.[5]

---

[5] Section 543(c) purports to divide the authority to select seven directors between the common stockholders and the preferred stockholders upon conversion of one-fourth or more of Amtrak's outstanding preferred stock

* * *

We hold that where, as here, the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment. We express no opinion as to whether Amtrak's refusal to display Lebron's advertisement violated that Amendment, but leave it to the Court of Appeals to decide that. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, dissenting.

The Court holds that Amtrak is a Government entity and therefore all of its actions are subject to constitutional challenge. Lebron, however, expressly disavowed this argument below, and consideration of this broad and unexpected question is precluded because it was not presented in the petition for certiorari. The question on which we granted certiorari is narrower: Whether the alleged suppression of Lebron's speech by Amtrak, as a concededly private entity, should be imputed to the Government. Because Amtrak's decision to reject Lebron's billboard proposal was a matter of private business judgment and not of Government coercion, I would affirm the judgment below.

I

This Court's Rule 14.1(a) provides: "Only the questions set forth in the petition, or fairly included therein, will be considered by the Court." While "[t]he statement of any question

---

to common stock. This subsection was originally enacted in 1970, and has not since been amended. It is irreconcilable with the revised provision for a nine-member board, § 543(a)(1).

presented will be deemed to comprise every subsidiary question," *ibid.*, questions that are merely "related" or "complementary" to the question presented are not "fairly included therein." *Yee* v. *Escondido*, 503 U. S. 519, 537–538 (1992) (emphasis deleted). In *Yee*, we held that a regulatory taking argument, while subsidiary to the umbrella question whether a taking had occurred, was only complementary to the physical taking inquiry set forth in the petition and thus was barred under Rule 14.1(a). See *id.*, at 535. Here, state action is the umbrella claim. Subsidiary to that claim, but complementary to each other, are two distinct questions: whether Amtrak is a Government entity, and whether Amtrak's conduct as a private actor is nevertheless attributable to the Government.

We granted certiorari on the following question, set forth in the petition:

> "Whether the court of appeals erred in holding that Amtrak's asserted policy barring the display of political advertising messages in Pennsylvania Station, New York, was not state action, where:
> "(a) the United States created Amtrak, endowed it with governmental powers, owns all its voting stock, and appoints all the members of its Board;
> "(b) the United States-appointed Board approved the advertising policy challenged here;
> "(c) the United States keeps Amtrak afloat every year by subsidizing its losses; and
> "(d) Pennsylvania Station was purchased for Amtrak by the United States and is shared with several other governmental entities." Pet. for Cert. i.

The question asks whether the challenged policy "was not state action" and therefore may, at first blush, appear to present the umbrella inquiry. *Yee* suggests otherwise. The petition there recited two decisions by the Courts of Appeals and asked: "Was it error for the state appellate court to dis-

regard the rulings and hold that there was no taking under the fifth and fourteenth amendments?" Instead of focusing on whether "there was no taking," we read the question as a whole. Since the decisions by the Courts of Appeals and the lower court opinion involved only physical takings, we concluded: "Fairly construed, then, petitioners' question presented is the equivalent of the question, 'Did the court below err in finding no physical taking?'" 503 U. S., at 537.

Just so here. The question asks whether the lower court erred and thus directs our attention to the decisions below. The District Court, in its thorough order, explicitly noted Lebron's theory of the case: "Plaintiff does not contend that Amtrak is a governmental agency. What plaintiff contends is that the federal government is sufficiently entwined in Amtrak's operations and authority that the particular actions at issue must be deemed governmental action." 811 F. Supp. 993, 999 (SDNY 1993). Before the Court of Appeals, in order to distinguish a long line of cases which held that Amtrak is not a Government agency, Lebron stated: "Since Lebron does not contend that Amtrak is a governmental entity per se, but rather is so interrelated to state entities that it should be treated as a state actor here, these cases are inapposite." Brief for Michael A. Lebron in No. 93–7127 (CA2), p. 30, n. 39.

The Court of Appeals, like the District Court, substantively discussed only the second question that Lebron argues here—whether Amtrak's conduct in this case implicates "the presence of government action in the activities of private entities." 12 F. 3d 388, 390 (CA2 1993). To introduce its analysis, the Court of Appeals did state that "[t]he Rail Passenger Service Act of 1970 . . . created Amtrak as a private, for-profit corporation under the District of Columbia Business Corporation Act," *ibid.*, relying on Congress' characterization of the corporation in 45 U. S. C. § 541. In so asserting, the Court of Appeals did not "'pas[s] upon'" the question such that it is now a proper basis for reversal, *ante*, at 379,

but rather merely identified the question that the court had to address and focused the inquiry on the precise argument presented by Lebron. This observation by the Court of Appeals is much like—indeed, much less extensive than—our discussion of Amtrak's status as a private corporation in *National Railroad Passenger Corporation* v. *Atchison, T. & S. F. R. Co.,* 470 U. S. 451, 453–456 (1985). I agree with the Court that *Atchison* does not bind us, *ante,* at 393–394, but, by the same token, I do not see how the court below could be said to have addressed the issue. A passing observation could not constitute binding precedent; so, too, it could not serve as the basis for reversal.

The question set forth in the petition focused on the specific action by Amtrak, not on the general nature of the corporation as a private or public entity. Lebron asked whether "Amtrak's asserted policy barring the display of political advertising messages in Pennsylvania Station, New York, was not state action." App. to Pet. for Cert. i. The list that follows this question, while partially concerning Amtrak's nature as an entity, went to support the thrust of the query, which is whether these enumerated attributes render Amtrak's advertising policy state action. Lebron's emphasis on the specific action challenged is the crucial difference between his alternative arguments for state action. The first inquiry—whether Amtrak is a Government entity—focuses on whether Amtrak is so controlled by the Government that it should be treated as a Government agency, and all of its decisions considered state action. The second inquiry takes Lebron at his word that Amtrak is *not* a Government entity and instead focuses on the State's influence on particular actions by Amtrak as a private actor.

Fairly construed, the question presented is whether the Court of Appeals erred in holding that the advertising policy of Amtrak, as a private entity, is not attributable to the Federal Government despite the corporation's links thereto. This question is closely related and complementary to, but

certainly not inclusive of, the question answered by the Court today, which is whether those links render Amtrak the functional equivalent of a Government agency. In my view, the latter question is barred by Rule 14.1(a).

Relying on *United States Nat. Bank of Ore.* v. *Independent Ins. Agents of America, Inc.*, 508 U. S. 439 (1993), the Court argues that it properly addresses whether Amtrak is a Government entity because that inquiry is "prior to the clearly presented question," namely, whether Amtrak's decision is attributable to the Government. *Ante*, at 382. *Independent Ins. Agents*, however, held only that the Court of Appeals had authority to consider a waived claim *sua sponte* and did not abuse its discretion in doing so.* That is quite different from the purpose for which the Court now marshals the case, which is to justify its consideration of a waived question in the first instance. As explained below, I do not question the Court's authority, only its prudence. In any event, the dispute in *Independent Ins. Agents* centered on the interpretation of a statute that may not have existed, and, as the Court recognizes, *ante*, at 383, n. 3, the decision simply applied the traditional principle that "[t]here can be no estoppel in the way of ascertaining the existence of a law." *South Ottawa* v. *Perkins*, 94 U. S. 260, 267 (1877). Here, one need not assume the existence of any predicate legal rule to accept Lebron's word that Amtrak is a private entity.

The mere fact that one question must be answered before another does not insulate the former from Rule 14.1(a) and other waiver rules. In *Stone* v. *Powell*, 428 U. S. 465 (1976),

---

*The Court would read more into the decision, because we "decline[d] even to brush aside the Court of Appeals' (questionable) contention that there was 'a "duty" to address the status of section 92,' saying only that '[w]e need not decide' that question." *Ante*, at 383, n. 3. But by (prudently) reserving the question, the Court could not have implied its answer. And our "complicit[y] in the [Court of Appeals'] enterprise," *ibid.*, exists only if one indulges in the unlikely inference that we held more than what we said we did.

we held that Fourth Amendment claims are not ordinarily cognizable in federal habeas proceedings and distinguished several cases by noting that "the issue of the substantive scope of the writ was not presented in the petition[s] for certiorari." *Id.*, at 481, n. 15. We thus recognized that those decisions properly avoided the question of cognizability, which question, of course, is logically anterior to the merits of the Fourth Amendment claims presented. In *Steagald* v. *United States*, 451 U. S. 204, 211 (1981), we held that the Government had conceded that the petitioner had a Fourth Amendment interest in the searched home, an inquiry that precedes the question that was preserved, whether the search was reasonable. In *Kamen* v. *Kemper Financial Services, Inc.*, 500 U. S. 90, 97, n. 4 (1991), because the question was neither litigated below nor included in the petition, we assumed the existence of a cause of action under § 20(a) of the Investment Company Act of 1940 before addressing the requirements of such an action. See also *Burks* v. *Lasker*, 441 U. S. 471, 476 (1979) (assuming same). Finally, in *McCormick* v. *United States*, 500 U. S. 257 (1991), the Court held that a state legislator did not violate the anti-extortion Hobbs Act, 18 U. S. C. § 1951, by accepting campaign contributions without an explicit exchange of improper promises. The Court reached this question only after declining to consider whether the Act applies to local officials at all, because that question was neither argued below nor included in the petition for certiorari. *McCormick*, 500 U. S., at 268, n. 6; see also *id.*, at 280 (SCALIA, J., concurring) (accepting the assumption, because the argument was waived, that the Hobbs Act is a "federal 'payment for official action' statute" even though "I think it well to bear in mind that the statute may not exist").

The Court does not take issue with these cases but argues further that, because the question whether Amtrak is a Government entity is "dependent upon many of the same factual inquiries [as the clearly presented question], refusing to re-

gard it as embraced within the petition may force us to assume what the facts will show to be ridiculous, a risk which ought to be avoided." *Ante,* at 382. A certain circularity inheres in this logic, because the Court must first answer the omitted question in order to determine whether its answer turns on "the same factual inquiries" as the clearly presented question. As for the facts, the record is shaped by the parties' arguments below. Perhaps serendipity has given the Court a factual record adequate to decide a question other than that advanced below, but there is no guarantee of such convergence. It is rather unfair to hold a party to a record that it may have developed differently in response to a different theory of the case. It is this risk of unfairness, rather than the fear of seeming "ridiculous," that we should avoid.

Rule 14.1(a), of course, imposes only a prudential limitation, but one that we disregard "only in the most exceptional cases." *Stone* v. *Powell, supra,* at 481, n. 15; see also *United States* v. *Mendenhall,* 446 U. S. 544, 551, n. 5 (1980). This is not one of them. As noted before, not only did Lebron disavow the argument that Amtrak is a Government entity below, he did so in order to distinguish troublesome cases. Lebron's postpetition attempt to resuscitate the claim that he himself put to rest is precisely the kind of bait-and-switch strategy that waiver rules, prudential or otherwise, are supposed to protect against. In *Steagald, supra,* at 211, for example, we stated unequivocally that "the Government, through its assertions, concessions, and acquiescence, has lost its right to challenge petitioner's assertion that he possessed a legitimate expectation of privacy in the searched home." I see no difference here.

The Rule's prudential limitation on our power of review serves two important purposes, both of which the Court disserves by deciding that Amtrak is a Government entity. First, the Rule provides notice and enables the respondent to sharpen its arguments in opposition to certiorari. "By

forcing the petitioner to choose his questions at the outset, Rule 14.1(a) relieves the respondent of the expense of unnecessary litigation on the merits and the burden of opposing certiorari on unpresented questions." *Yee*, 503 U. S., at 536. Lebron argues that Amtrak has waived its Rule 14.1(a) argument by failing to object in the brief in opposition to certiorari. But that is exactly the point: The question set forth did not fairly include an argument that Amtrak is a Government agency, and, indeed, the petition was devoted to whether Amtrak's private decision should be imputed to the State. Even at pages 16–18, the petition did not "fairly embrac[e] the argument that Lebron now advances," *ante*, at 380, but rather argued that the composition of Amtrak's board "renders *an otherwise private entity* a state actor," Pet. for Cert. 16 (emphasis added)—thus specifically repeating the concession he now wishes to withdraw. Amtrak could not respond to a point not argued and did not waive an argument that was not at issue. Not until the merits brief did Amtrak have notice that Lebron would contradict his persistent assertion that the corporation was a private entity.

Second, the Rule assists the management of our cases. "Rule 14.1(a) forces the parties to focus on the questions the Court has viewed as particularly important, thus enabling us to make efficient use of our resources." *Yee, supra*, at 536. We normally grant only petitions that present an important question of law on which the lower courts are in conflict. Here, the lower courts have generally held that Amtrak is not a Government entity, see, *e. g., Anderson* v. *National Railroad Passenger Corporation*, 754 F. 2d 202, 204 (CA7 1985); *Ehm* v. *National Railroad Passenger Corporation*, 732 F. 2d 1250, 1255 (CA5), cert. denied, 469 U. S. 982 (1984), and none of our cases suggest otherwise. Even where the lower courts are in clear conflict, we often defer consideration of novel questions of law to permit further development. Despite the prevalence of publicly owned corporations, whether they are Government agencies is a question

seldom answered, and then only for limited purposes. See *Cherry Cotton Mills, Inc.* v. *United States*, 327 U. S. 536, 539 (1946); *National Railroad Passenger Corporation* v. *Atchison, T. & S. F. R. Co.*, 470 U. S., at 471. Answering this question today merely opens the back door to premature adjudication of similarly broad and novel theories in the future.

Weeding out such endeavors, Rule 14.1(a), like other waiver rules, rests firmly upon a limited view of our judicial power. See, *e. g.*, *Carducci* v. *Regan*, 714 F. 2d 171, 177 (CADC 1983) (Scalia, J.) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them"). "The doctrine of judicial restraint teaches us that patience in the judicial resolution of conflicts may sometimes produce the most desirable result." Stevens, Some Thoughts on Judicial Restraint, 66 Judicature 177, 183 (1982). Whether the result of today's decision is desirable I do not decide. But I think it clear that the Court has exhibited little patience in reaching that result.

## II

Accepting Lebron's concession that Amtrak is a private entity, I must "traverse th[e] difficult terrain," *ante*, at 378, that the Court sees fit to avoid, and answer the question that is properly presented to us: whether Amtrak's decision to ban Lebron's speech, although made by a concededly private entity, is nevertheless attributable to the Government and therefore considered state action for constitutional purposes. Reflecting the discontinuity that marks the law in this area, we have variously characterized the inquiry as whether "there is a sufficiently close nexus between the State and the challenged action," *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 351 (1974); whether the State, by encouraging the challenged conduct, could be thought *"responsible* for those

actions," *Blum* v. *Yaretsky,* 457 U. S. 991, 1005 (1982); and whether "the alleged infringement of federal rights [is] 'fairly attributable to the State,'" *Rendell-Baker* v. *Kohn,* 457 U. S. 830, 838 (1982), quoting *Lugar* v. *Edmondson Oil Co.,* 457 U. S. 922, 937 (1982). Whatever the semantic formulation, I remain of the view that the conduct of a private actor is not subject to constitutional challenge if such conduct is "fundamentally a matter of private choice and not state action." *Edmonson* v. *Leesville Concrete Co.,* 500 U. S. 614, 632 (1991) (O'CONNOR, J., dissenting).

Lebron relies heavily on *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715 (1961). There, the Court perceived a symbiotic relationship between a racially segregated restaurant and a state agency from which the restaurant leased public space. Noting that the State stood to profit from the discrimination, the Court held that the government had "so far insinuated itself into a position of interdependence with" the private restaurant that it was in effect "a joint participant in the challenged activity." *Id.,* at 725. Focusing on this language, Lebron argues that various features of Amtrak's structure and management—its statutory genesis, the heavy reliance on federal subsidies, and a board appointed by the President—places it in a symbiotic relationship with the Government such that the decision to ban Lebron's speech should be imputed to the State.

Our decision in *Burton,* however, was quite narrow. We recognized "the limits of our inquiry" and emphasized that our decision depended on the "peculiar facts [and] circumstances present." *Id.,* at 726. We have since noted that *Burton* limited its "actual holding to lessees of public property," *Jackson* v. *Metropolitan Edison Co., supra,* at 358, and our recent decisions in this area have led commentators to doubt its continuing vitality, see, *e. g.,* L. Tribe, American Constitutional Law § 18–3, p. 1701, n. 13 (2d ed. 1988) ("The only surviving explanation of the result in *Burton* may be that found in Justice Stewart's concurrence").

In *Jackson,* we held that a private utility's termination of service to a customer is not subject to due process challenge, even though the termination was made pursuant to a state law. In doing so, we made clear that the question turns on whether the challenged conduct results from private choice: "Respondent's exercise of the choice allowed by state law where the initiative comes from it and not from the State, does not make its action in doing so 'state action' for purposes of the Fourteenth Amendment." 419 U. S., at 357 (footnote omitted). The rule applies even where the private entity makes its decision in an environment heavily regulated by the government. *Rendell-Baker, supra,* involved a private school for troubled students who were transferred there by authority of a state law, and for whose education the State paid the school. Public funds comprised 90% to 99% of the school budget. The school fired petitioners, and a state grievance board reviewed that personnel action. Despite the school's pervasive ties to the State, we held that the discharge decisions were not subject to constitutional challenge because those actions "were not compelled or even influenced by any state regulation." *Id.,* at 841. We noted that "in contrast to the extensive regulation of the school generally, the various regulators showed relatively little interest in the school's personnel matters." *Ibid.* Likewise, in *Blum* v. *Yaretsky, supra,* we held that the decisions of a regulated hospital to discharge its patients were not subject to constitutional challenge. Although various Medicaid regulations and benefit adjustment procedures may have encouraged the hospital's decisions to discharge its patients early, we held that the State was not *"responsible* for those actions" because such actions "ultimately turn on medical judgments made by private parties according to professional standards that are not established by the State." *Id.,* at 1005, 1008. See also *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.,* 483 U. S. 522, 547 (1987) ("There is no evidence that the Federal Government coerced

or encouraged the USOC in the exercise of its right [to deny use of its copyright]").

These cases differ markedly from the "interdependence" or "joint participation" analysis of *Burton* and stand for the principle that, unless the government affirmatively influenced or coerced the private party to undertake the challenged action, such conduct is not state action for constitutional purposes. *Edmonson* v. *Leesville Concrete Co., supra,* is not to the contrary. In that case, the Court held that a private attorney's exercise of a peremptory challenge is attributable to the government and therefore subject to constitutional inquiry. Although the opinion cited *Burton,* see 500 U. S., at 621, 624, it emphasized that a private party exercising a peremptory challenge enjoys the "overt, significant assistance of the court," *id.,* at 624. The decision therefore is an application of *Shelley* v. *Kraemer,* 334 U. S. 1, 19 (1948), which focused on the use of the State's coercive power, through its courts, to effect the litigant's allegedly unconstitutional choice. Moreover, *Edmonson* stressed that a litigant exercising a peremptory challenge performs a "traditional function of the government," 500 U. S., at 624, a theory of state action established by *Marsh* v. *Alabama,* 326 U. S. 501 (1946), that is independent from *Burton* and not relevant to this case.

Relying thus on *Shelley* and *Marsh, Edmonson* did not necessarily extend the "interdependence" rationale of *Burton* beyond the limited facts of that case. Given the pervasive role of government in our society, a test of state action predicated upon public and private "interdependence" sweeps much too broadly and would subject to constitutional challenge the most pedestrian of everyday activities, a problem that the Court recognized in *Burton* itself, see 365 U. S., at 725–726. A more refined inquiry is that established by *Jackson, Rendell-Baker, Blum,* and *San Francisco Arts & Athletics:* The conduct of a private entity is not subject to constitutional scrutiny if the challenged action results from

the exercise of private choice and not from state influence or coercion.

Applying this principle to the facts before us, I see no basis to impute to the Government Amtrak's decision to disapprove Lebron's advertisement. Although a number of factors indicate the Government's pervasive influence in Amtrak's management and operation, none suggest that the Government had any effect on Amtrak's decision to turn down Lebron's proposal. The advertising policy that allegedly violates the First Amendment originated with a predecessor to Amtrak, the wholly private Pennsylvania Railroad Company. A 1967 lease by that company, for example, prohibited "any advertisement which in the judgement of Licensor is or might be deemed to be slanderous, libelous, unlawful, immoral, [or] offensive to good taste . . . ." App. 326, ¶ 19. Amtrak simply continued this policy after it took over. The specific decision to disapprove Lebron's advertising was made by Amtrak's Vice President of Real Estate and Operations Development, who, as a corporate officer, was neither appointed by the President nor directed by the President-appointed board to disapprove Lebron's proposal.

Lebron nevertheless contends that the board, through its approval of the advertising policy, controlled the adverse action against him. This contention rests on the faulty premise that Amtrak's directors are state actors simply because they were appointed by the President; it assumes that the board members sit as public officials and not as business directors, thus begging the question whether Amtrak is a Government agency or a private entity. In any event, even accepting Lebron's premise that the board's approval has constitutional significance, the factual record belies his contention. The particular lease that permitted Amtrak to disallow Lebron's billboard was neither reviewed nor approved directly by the board. In fact, minutes of meetings dating back to 1985 showed that the board approved only one contract between Amtrak and Transportation Displays, Incor-

porated, the billboard leasing company that served as Amtrak's agent, and even then it is not clear whether the board approved the contract or merely delegated authority to execute the licensing agreement. App. 402. In short, nothing in this case suggests that the Government controlled, coerced, or even influenced Amtrak's decision, made pursuant to corporate policy and private business judgment, to disapprove the advertisement proposed by Lebron.

Presented with this question, the Court of Appeals properly applied our precedents and did not impute Amtrak's decision to the Government. I would affirm on this basis and not reverse the Court of Appeals based on a theory that is foreign to this case. Respectfully, I dissent.