# Applicability of 18 U.S.C. § 208 to the Federal Communications Commission's Representative on the Board of Directors of the Telecommunications Development Fund

Because the Telecommunications Development Fund is a non-profit entity that is owned, funded, and controlled by the federal government, it is not an "organization" within the meaning of 18 U S.C. § 208. Therefore, the restrictions in § 208 do not apply to the service of the Federal Communications Commission's General Counsel on the Board of Directors of the Fund.

June 12, 1997

MEMORANDUM OPINION FOR THE ASSOCIATE GENERAL COUNSEL AND
ALTERNATE DESIGNATED AGENCY ETHICS OFFICIAL
FEDERAL COMMUNICATIONS COMMISSION

This memorandum responds to your request for an opinion whether the appointment of the General Counsel of the Federal Communications Commission ("FCC") to the Board of Directors of the Telecommunications Development Fund ("TDF") has created the possibility of a conflict of interest under 18 U.S.C. § 208 (1994) or a breach of fiduciary duty.[1] We have concluded that because the TDF is owned, funded, and controlled by the federal government, it is not an "organization" within the meaning of § 208, and that section's restrictions thus do not apply to the General Counsel's service on the TDF board. Because the existence or scope of a TDF director's fiduciary duty to the TDF is not material to our analysis, and because such a determination is a subject beyond our particular expertise, we have not addressed that question in our opinion.

## I. Background

Congress established the TDF as part of the Telecommunications Act of 1996, Pub. L. No. 104–104, § 707, 110 Stat. 56, 154 ("the Act") "to promote access to capital for small businesses in order to enhance competition in the telecommunications industry." 47 U.S.C. § 614(a)(1) (Supp. II 1996). The TDF will operate as a non-profit "quasi-governmental entity." H.R. Conf. Rep. No. 104–458, at 210–11 (1996) ("Conference Report"). The TDF's primary source of funds is the interest accrued on the deposits of parties making competitive bids on electromagnetic spectrum bandwidth, 47 U.S.C. § 309(j) (1994); the Act also authorizes the TDF to receive appropriations and to accept donations. The TDF funds will be used for loans, investments, and other extensions of credit to eligible small businesses. 47 U.S.C. § 614(e).

---

[1] See Letter for Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, from Sheldon M. Guttman, Associate General Counsel and Alternate Designated Agency Ethics Official, Federal Communications Commission (May 30, 1996).

The TDF is governed by a seven member board of directors appointed by the FCC Chairman. 47 U.S.C. § 614(c)(1). ''Four of such directors shall be representative of the private sector and three of such directors shall be representative of the [FCC], the Small Business Administration, and the Department of the Treasury, respectively.'' *Id.* The board of directors determines the general policies governing the operation of the TDF, approves the TDF Chairman's appointments of persons to fill the offices provided for in its bylaws, and defines the TDF's lending policies. *Id.* § 614(c)(3), (f)(4).

As of the date of your request, the FCC Chairman had appointed two members of the TDF board: the board's chairman, who is a representative of the private sector, and the General Counsel of the FCC, Mr. William E. Kennard, who is a representative of the FCC. Mr. Kennard will continue as the General Counsel of the FCC while serving on the TDF board. He will not receive any compensation for his service on the TDF board. You are concerned that this dual role may raise the possibility of a conflict of interest under 18 U.S.C. § 208.

## II. Discussion

Under 18 U.S.C. § 208(a), an officer or employee of the executive branch generally is prohibited from participating personally and substantially for the government in a ''particular matter in which . . . [an] organization in which he is serving as officer, director, trustee, partner or employee . . . has a financial interest.'' Section 208 thus usually would require a government official to be disqualified from taking part in a particular matter affecting the financial interest of an organization on whose board of directors he or she sits.[2]

We have not before considered, however, whether § 208 applies to a federal employee's service on the board of a quasi-governmental organization where each member of the board is appointed by a federal officer. Section 208 is premised on the concern that a federal official's personal obligations may conflict with the duties of his or her public office.[3] Section 208 was not meant to cover conflicts that might arise between the different interests of two federal entities. If the TDF is properly considered a governmental entity rather than a private entity, any potential conflict between the federal offical's duties to the FCC and his duties as a director of the TDF would be an intra-governmental conflict between two arms of the federal government, rather than a conflict between the interests of

---

[2] *See* Memorandum for David H. Martin, Director, Office of Government Ethics, from Samuel A. Alito, Jr , Deputy Assistant Attorney General, Office of Legal Counsel, *Re USIA Director's Service on the Board of the United States Telecommunications Training Institute* at 1 (Dec 3, 1986).

[3] *See Questions Raised by the Attorney General's Service as a Trustee of the National Trust for Historic Preservation,* 6 Op O.L.C 443, 446 (1982).

the federal government and the interests of an outside organization.[4] We thus begin by examining whether the TDF is a private entity for purposes of § 208.

## A. Section 208's Applicability to Organizations in the Federal Government

Section 208 generally disqualifies an executive branch employee from participating for the government in a particular matter in which an "organization in which he is serving as a[ ] . . . director" has a financial interest. 18 U.S.C. § 208(a). Because the term "organization" is not defined in the statute, we have examined § 208's legislative history for indications as to what types of entities Congress intended the term to include.

According to the Senate Report that accompanied the Bribery, Graft and Conflicts of Interest Act of 1962, Pub. L. No. 87–849, 76 Stat. 1119, Congress used the term "organization" in § 208 in order to reach potential conflicts with both non-profit and for-profit entities outside of the federal government. S. Rep. No. 87–2213, at 14 (1962), *reprinted in* 1962 U.S.C.C.A.N. 3852, 3862. Section 208 was modeled on the former § 434 of title 18, which "disqualifie[d] an employee of the Government who has an interest in the profits or contracts of a business entity from the transaction of business with such entity." *Id.* at 13, *reprinted in* 1962 U.S.C.C.A.N. at 3862. Section 208(a) was intended to improve upon § 434 "by abandoning the limiting concept of a 'transaction of business,'" instead embracing "any participation on behalf of the Government in a matter in which the employee has an *outside financial interest.*" *Id.* (emphasis added). The replacement of the term "business organization" with the more inclusive "organization," the Senate Report further states, was also intended to clarify that employees were not to act for the government in matters involving non-profit corporations to which they were connected. *Id.* at 14, *reprinted in* 1962 U.S.C.C.A.N. at 3862 (noting the many universities, non-profit foundations, and research entities then engaged in government work). The Senate Report nowhere

---

[4] In general, the same person may hold more than one office in the executive branch *See* Memorandum for Philip B Heymann, Deputy Attorney General, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re Creation of an Office of Investigative Agency Policies* at 6 (Oct 26, 1993) (repeal of prohibition on dual officeholding and enactment of statute prohibiting dual compensation impliedly permits holding two offices simultaneously) Our office has suggested, however, that the common law doctrine of "incompatibility" might in some cases limit the ability of a person to hold two offices at the same time Two offices are "incompatible" at common law if public policy would make it improper for one person to perform both functions, as where, for example, Congress creates one of the two offices as a "statutory check" on the other. *See, e g*, Memorandum for Arnold Intrater, General Counsel, Office of White House Administration, from John O McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re Dual Office of Executive Secretary of National Security Council and Special Assistant* at 3–4 (Mar 1, 1988) (also noting possible incompatibility where the official interests of the two positions conflict or where one office adjudicates matters in which the other is a party). While this office has "continued to refer to the doctrine in our opinions," we have recognized that "[i]t is arguable that it has either fallen into desuetude or been repealed by statute " Memorandum for Edward C Schmults, Deputy Attorney General, from Theodore B Olson, Assistant Attorney General, Office of Legal Counsel, *Re· Appointment of D. Lowell Jensen as Associate Attorney General* at 3, 4 (June 14, 1983) You have not asked, and this opinion does not address, whether the offices of General Counsel of the FCC and service on the TDF Board are incompatible, but we would be pleased to assist you with that question if you believe it is an issue.

suggests an intention to bar federal employees from involvement in matters affecting other federal agencies, or federally owned and controlled corporations.[5]

## B. The TDF is a Federal Government Entity for Purposes of Section 208

We thus turn to the question of whether the TDF may be characterized as a part of the federal government for purposes of § 208, or whether it should be deemed an outside, non-governmental organization triggering that section's restrictions. The Telecommunications Act does not address whether service on the TDF board is to be considered service on a non-governmental organization within the meaning of § 208, and offers no definitive statement of the TDF's status in or with the federal government. The Conference Report's only comment on the status of the TDF is that it "is formulated to serve as a quasi-governmental entity." Conference Report at 210.

This lack of definition is not unusual. While the United States has long employed the corporate form to achieve governmental objectives, *see generally Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 386–91 (1995), there is "no comprehensive descriptive definition of or criteria for creating government corporations." U.S. General Accounting Office, *Government Corporations*, 2–3 (December 1995) ("GAO Report"). The Government Corporations Control Act, 31 U.S.C. §§ 9101–9110, imposes various recordkeeping, reporting, and budgetary requirements on the "wholly owned" and "mixed ownership" government corporations listed in § 9101 of that statute, but does not purport to list all of the corporate entities in which the federal government presently participates. The TDF is not among the organizations listed in 31 U.S.C. § 9101.

While undertaken for different purposes and in a different context, the analysis of the GAO in its most recent report on government corporations is instructive. *See* GAO Report. In that report, the GAO developed a taxonomy which first divided the universe into two categories: public and private. Public entities, owned and controlled by the public sector, were further divided between "government agencies" and "government corporations." Private entities, in turn, were subdivided into "government sponsored enterprises" and "private corporations." GAO Report at 4–5. The TDF had not been established at the time of the GAO's report. The GAO surveyed fifty-eight entities and included data on the twenty-two entities that reported themselves to be government corporations. The GAO also included data on five entities that did not consider themselves government corporations, but that the GAO and others frequently consider to be some type

---

[5] *Accord* Roswell B. Perkins, *The New Federal Conflict-of-Interest Law*, 76 Harv. L. Rev 1113, 1129–36 (1963) (consistently characterizing aim of § 208 as preventing conflicts with "private economic interests," "private parties," and "outside entities"), Bayless Manning, *Federal Conflict of Interest Law* § 2–4.2a (1964) (discussing two instances in which the former § 434 did not apply to a federal employee's service with organizations established and controlled by the federal government, in part because such organizations were "established by the government itself to carry out governmental policies considered to be in the public interest").

of government corporation, and that receive operating funds from yearly federal appropriations.[6]

For the purposes of our inquiry, the distinctions between public ''government corporations'' and private ''government sponsored enterprises'' are most relevant. The GAO's classification scheme focused on the following factors: funding sources, particularly receipt of government appropriations; ownership; control; non-profit or for-profit status; and the application of fifteen federal laws that generally govern the operation of federal agencies.[7] Government corporations typically receive full or partial funding from the U.S. government. While some are part of a government agency, government corporations are granted some flexibility in adhering to federal statutes and regulations. Government-sponsored enterprises, in contrast, were described as ''federally established, privately owned corporations designed to increase the flow of credit to specific economic sectors.'' *Id.* at 4 n.9. These enterprises are typically financed by private investors, privately owned and controlled, and profit-seeking. They generally do not receive government appropriations. While regulated by the federal government to protect the government's interest, government enterprises are less likely to be subject to the range of statutes governing federal agency operations. *Id.* at 4–5.

With these factors in mind, we revisit the structure and operations of the TDF. On four of the five measures identified by the GAO — funding, ownership, control, and non-profit status — the TDF matches the paradigm of a government corporation. It is a non-profit entity primarily funded by interest on deposits with the FCC for bandwidth auctions. It is also authorized to receive appropriations and donations. The TDF is not a stock corporation, and presumably, its assets belong entirely to the United States. While the FCC Chairman does not direct the day-to-day operations of the TDF, his authority to appoint the entire Board gives him a significant degree of control over its policies and performance. Unlike the majority of the government corporations in the GAO study, however, the TDF is not expressly subject to the requirements of any of the federal statutes selected

---

[6] The twenty-two entities that reported themselves as government corporations in 1995 were the African Development Foundation, the Commodity Credit Corporation, the Community Development Financial Institutions Fund, the Corporation for National and Community Service, the Export-Import Bank, the Federal Crop Insurance Corporation, the FDIC, the Federal Housing Administration, the Federal Prison Industries, the Government National Mortgage Association, the National Credit Union Administration, Amtrak, the Overseas Private Investment Corporation, the Pennsylvania Avenue Development Corporation, the Pension Benefit Guaranty Corporation, the Resolution Funding Corporation, the Resolution Trust Corporation, the Rural Telephone Bank, the St Lawrence Seaway Development Corporation, the Tennessee Valley Authority, the Financing Corporation, and the United States Enrichment Corporation GAO Report at 7–8. The five other federally funded entities included in the GAO report were the Corporation for Public Broadcasting (which reported itself to be a private, non-profit corporation), the Inter-American Foundation (reported as a federal agency), the Legal Services Corporation (a private, non-profit corporation), the Neighborhood Reinvestment Corporation (a public, non-profit corporation), and the U.S. Postal Service (an independent establishment of the executive branch). *Id.* at 2 n 4.

[7] Most of the twenty-two government corporations in the GAO study were exempt from the pay and classification requirements of title 5; the requirements of competitive contracting; the Federal Manager's Integrity Act, and the Federal Credit Reform Act More than two-thirds, however, were subject to the Ethics in Government Act, the Government Corporation Control Act; the Privacy Act; the Freedom of Information Act, and the Inspector General Act. GAO Report at 9–10

for the study. You have indicated that the TDF is presently considering to what extent it will adopt policies and bylaws consistent with the requirements of some of these statutes.

In summary, the TDF is a non-profit entity wholly owned by the federal government. It also receives the vast majority of its funds from the federal government, although not from yearly appropriations. Its policy and operations will be governed by directors appointed by the FCC Chairman. Congress did not subject the TDF to the five statutes most often applicable to government corporations. Given the FCC Chairman's authority over the selection of the TDF's board, and the absence of any private ownership or interest, however, the failure to apply those statutes, which need not be applied to government corporations, does not counsel deeming the TDF an outside organization. It is thus appropriate to characterize the TDF as a federal government entity for purposes of § 208.[8]

## III. Conclusion

Because the TDF is a non-profit entity that is entirely owned, funded, and controlled by the federal government, § 208's restrictions do not apply to the service of the FCC General Counsel on the TDF's board of directors.

RICHARD L. SHIFFRIN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[8] In 1994, we examined a question similar to the issue you have presented and concluded that § 208 would apply to a Deputy Assistant Secretary of the Department of the Treasury appointed to the Board of Directors of the College Construction Loan Insurance Association ("Connie Lee"). *See Applicability of 18 U S.C § 208 to the Proposed Appointment of the Deputy Assistant Secretary to the Board of the College Construction Loan Insurance Association,* 18 Op. O L C. 136 (1994). While that opinion did not consider whether Connie Lee could be deemed a part of the federal government for purposes of § 208, we note that Connie Lee was established as a private, for-profit stock corporation It began operating as a joint venture between the Secretary of Education and the Student Loan Marketing Association ("Sallie Mae"), but Congress directed that it ultimately become a private corporation Three members of its eleven member board were appointed by the private Sallie Mae corporation, two by the Secretary of Education, and two by the Secretary of the Treasury. The four remaining directors were selected by the common stockholders, who at that time were the Secretary of Education and Sallie Mae Upon the sale of the Secretary of Education's stock and privatization, the entire board will be elected by the stockholders