**Jack JERSAWITZ, Plaintiff,**

v.

**PEOPLE TV, et al., Defendant.**

**No. Civ.A. 197CV290CAM.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 30, 1999.

Order Denying Reconsideration,
Oct. 21, 1999.

Jack Jersawitz, Atlanta, GA, for Public Access Television Producer, plaintiff pro se.

Thomas Arthur Cox, Jr., Maureen Mae McLeod, Johnson Freeman & Perkins–Hooker, Atlanta, GA, Cynthia W. Roseberry, Ewing & Roseberry, Atlanta, GA, for People TV, People TV Board of Directors, Gary Bastian, People TV Board Chairman, defendants.

Ronald Jeff Freeman, Thomas Arthur Cox, Jr., Maureen Mae McLeod, Johnson Freeman & Perkins–Hooker, Atlanta, GA, Cynthia W. Roseberry, Ewing & Roseber-

ry, Atlanta, GA, for Valencia Goodman, Program Director, Donna Fowler, defendants.

Ronald Jeff Freeman, Thomas Arthur Cox, Jr., Johnson Freeman & Perkins–Hooker, Atlanta, GA, for Chris Leonard, Ex–People TV Manager, defendant.

William H. McLean, IV, Office of Atlanta City Attorney Law Department, Atlanta, GA, Ronald Jeff Freeman, Thomas Arthur Cox, Jr., Johnson Freeman & Perkins–Hooker, Atlanta, GA, for Bill Campbell, Atlanta Mayor, City of Atlanta, defendants.

### ORDER

MOYE, Senior District Judge.

Plaintiff Jack Jersawitz, a public access television producer, filed this section 1983 case against Defendants, People TV, Inc., the People TV Board of Directors and various employees and former employees of People TV (hereinafter collectively People TV), and the City of Atlanta and Bill Campbell, Mayor (hereinafter collectively City of Atlanta or City), alleging People TV and the City of Atlanta violated his First Amendment rights by barring his access to the People TV facilities and equipment. The case is before the Court on People TV's motion to dismiss or, in the alternative, for summary judgment, on Plaintiff's motion for summary judgment, on the City of Atlanta's motions for summary judgment and to accept its motion for summary judgment out of time, on Plaintiff's request for oral argument, and on Plaintiff's request that the Court accept his late response to the City's motion. The Court DENIES Plaintiff's request for oral argument, GRANTS Plaintiff's unopposed request to accept his late response, and GRANTS the City's unopposed motion to accept its motion for summary judgment out of time. For the reasons stated herein, the Court DENIES People TV's motion to dismiss, GRANTS the City of Atlanta's motion for summary judgment, DENIES Plaintiff's motion for summary judgment and GRANTS in part and DE-NIES in part People TV's motion for summary judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On January 1, 1995, the City of Atlanta entered a cable franchise agreement "to construct, reconstruct, operate and maintain a cable communications system to provide cable services within the City." As part of the franchise agreement, the franchisee was required to provide "two (2) access channels for public access use." The franchisee was also required to provide $1,950,000 for initial equipment and for facilities renovation for government and public access and, beginning in the fourth year of the agreement, $1,400,000 for replacement equipment for government and public access.

In November 1995, the City of Atlanta entered an agreement with People TV to "provide for the management of day-to-day operations of the public access production facilities in the City." The agreement applied "to all production facilities dedicated to public access." "Public Access" was defined as "the system under which members of the public have access to cable television or other communication technology in order to communicate their noncommercial activities, opinions and ideas subject to applicable law and this Agreement." "Public Access Channel" was defined as "any channel designated or dedicated for use by the general public or noncommercial organizations which is provided to the City by the Franchisee at no charge to the City or the programmers of the channel." "Production Facilities" was defined to mean "any channel, studio, vehicle, equipment, furnishings or other property which [People TV] owns or the [franchisee] is to provide under this Agreement, the Franchise Agreement, or any other federal, state, or local law, for use in connection with the production and cablecasting of public access programming and operations of the public access center(s)." The City and People TV agreed that "public access

provided for herein is for non-profit, non-commercial purposes and for the production of programming to be cablecast on the public access channel." People TV agreed to "comply with all applicable federal, state and local laws, rules, regulations, and policies." People TV was directed to "operate public access on a nondiscriminatory and reasonable basis," but, "to the extent that the fulfillment of other purposes of this Agreement allow it," was permitted to "operate based upon the principle of first-come, first-served." The Board of Directors of People TV consist of five directors appointed by the Mayor, six appointed by the City Council, one appointed by the cable franchisee, and up to nine elected by the Board itself. People TV was directed to "promulgate rules and regulations for the administration of its production facilities and its operations which are nondiscriminatory and reasonable and consistent with the policies set forth herein." The agreement specifically provided that People TV "is not, nor shall it be deemed to be, or hold itself out to be, a department or operating agency of the City," and People TV was required to display both on the public access channels and at its facilities a disclaimer stating: "[People TV] is an independent, non-profit community organization which operates public access in Atlanta. The Center is not an agent or affiliate of the City of Atlanta or the Cable Operator." People TV was given the right "to limit, terminate, or suspend the use of production facilities by any person who uses such production facilities to produce programming of a nature prohibited [under the terms of the agreement] or who fails to abide by reasonable rules of [People TV]." People TV was required to "set reasonable standards for the qualifications required of persons using public access production facilities," and the standards had to be nondiscriminatory and to "reflect the interest of all users in protecting production facilities from damage and prolonging its useful life." People TV was prohibited from selling, conveying, or leasing, without the written permission of the Mayor, assets

acquired pursuant to the agreement. Funding for operations of People TV was provided by the City from funds paid by the franchisee, and funding for equipment was provided directly to People TV by the franchisee from funds specified in the franchise agreement. Upon the expiration or termination of the agreement, People TV was required to "transfer to the City its ownership or leasehold interests in any production facilities acquired through monies received from the [franchisee]" pursuant to the agreement.

Although rules and regulations were not formally published by People TV, a draft of the People TV Handbook for Producers, containing the rules and regulations, was printed in 1997, and Plaintiff acknowledged he saw a copy of the Handbook. The Introduction to the Handbook states that People TV's mission includes "advocating Public Access and First Amendment Rights" and that "[s]peaking in the most general terms, People TV, Inc. operates on a *First Come, First Served* basis." (emphasis in original). In an "Overview of Public Access in America," the Handbook states:

> As cable systems grew, especially during the 1980's, Public Access provided Freedom of Expression outlet on cable television. On cable, it was developed into the new town square meeting place in an America and a world growing more and more electronic. In the 1990's, rapid changes in technology, and frequent changes in the legal landscape, have forced Public Access to adapt and adopt new strategies.

In an "Overview of Rules and Regulations" the Handbook states:

> People TV, Inc. is a community based organization that exists to serve all of the diverse elements that make up the City of Atlanta.... It is required that we protect our equipment and the facilities of People TV. The rules, regulations, and procedures of People TV, Inc. exist to help us accomplish our mission and accommodate the largest number of peo-

ple possible in the fairest manner to each.

The Handbook establishes certain qualifying requirements for use of the facilities and equipment and specifies that a producer "has the right of controlling the content of a program" but also details certain responsibilities of a producer, which include abiding by various rules and regulations. The Handbook further states: "[E]veryone coming into the facility must respect all the other diverse Producers, crews, guests, talent, and various others who will be in our facilities. In addition to this respectful attitude, you are expected to know and abide by all of the rules and regulations of People TV." In stating sanctions for violations of the rules and regulations, the Handbook specifies that all use of the facilities including production and playback may be terminated, suspended, or limited. An appeals procedure is provided for all sanctions.

For many years, Plaintiff produced a television show on public access television using the facilities of People TV. In December 1995, People TV shut down its facilities for major renovations, against the strong objections of Plaintiff. Plaintiff told the People TV Board of Directors that he believed the construction budget was inflated and that he intended to monitor all meetings and records "to discover any theft, kickbacks or other siphoning of funds."

Despite Plaintiff's request that his weekly television show continue to be assigned the 6:00 PM Wednesday time slot, People TV moved Plaintiff's show to 10:00 PM Friday. Plaintiff was told that his time slot was changed in order to locate all political programs in one block of time.

In October 1996, at a meeting between People TV and the producers, Plaintiff insisted on videotaping the meeting with his personal camera. When he was asked to turn off the camera, Plaintiff refused, contending that the meeting was a public meeting in a public facility. The meeting was ended when Plaintiff refused to turn off the camera. In a case filed by Plain-

tiff, the Fulton County Superior Court determined that meetings of People TV are not subject to Georgia's Sunshine Laws. The case was not appealed. This Court may not reconsider the issue. *See, United States v. Jefferson County*, 720 F.2d 1511, 1517–18 (11th Cir.1983) ("The principles of res judicata and collateral estoppel ... prevent the attack of a prior judgment by parties to the proceedings.").

On January 30, 1997, when Plaintiff arrived to use the facilities of People TV at a time he had reserved for such use, he was handed a letter informing him that he was no longer welcome on the property of People TV, Inc., and that he would be arrested for criminal trespass if he entered the land or premises for any reason. He was further informed that if he did not cease harassing representatives and staff of People TV, Inc., with telephone calls, facsimiles, and other communications, a warrant would be taken out for his arrest. Plaintiff refused to leave the property and was arrested for criminal trespass. Plaintiff's criminal case is still before the State courts and is not at issue before this Court.

On February 4, 1997, Plaintiff, acting pro se, filed his complaint alleging numerous violations of various rights by People TV and the City of Atlanta. At a hearing before this Court on January 27, 1998, Plaintiff acknowledged that the only claims he is pursuing relate to his First Amendment right to be on the premises of People TV and use the facilities and equipment of People TV as he wishes without interference. He has, therefore, abandoned all claims relating to his arrest for criminal trespass and to the Georgia Sunshine Laws.

On August 18, 1998, People TV filed a motion to dismiss or in the alternative, for summary judgment. People TV contends that, as it is a private, non-profit corporation and not an agency of the City of Atlanta, it cannot be sued pursuant to 42 U.S.C. § 1983. People TV further contends Plaintiff is an "activist" and "profes-

sional litigant" and has "initiated a campaign of harassment" against People TV by attempting to disrupt Board meetings, threatening management and staff, and filing law suits against People TV. People TV contends Plaintiff was barred from its facility for failure to abide by its established rules and regulations and for his threats against management and staff and that barring him was completely unrelated to his right to free speech.

On September 1, 1998, Plaintiff filed a response to People TV's motion to dismiss or for summary judgment and, on September 8, a motion for summary judgment. Plaintiff contends People TV, despite the disclaimers in its contract with the City, is an agency of the City of Atlanta. He further contends People TV is the operator of a public access television channel which is a created public forum. He contends People TV has no written or otherwise formalized rules or regulations and has imposed arbitrary and capricious rules and regulations without showing a compelling government interest as a basis for the rules and regulations. Although Plaintiff contends People TV has offered no evidence that he has violated any rules or regulations or that he has harassed or threatened or harmed anyone at People TV, he acknowledges that he has, "on numerous occasions," complained "about the continuous violations of the contract between the City and [People TV]"; that he has been threatened with arrest for videotaping meetings at People TV; and that he has "used both phone and fax to register complaints or lawful demands."

On October 15, 1998, the City of Atlanta filed a motion for summary judgment. The City contends it cannot be held liable because there is no policy or custom of the City that violates Plaintiff's First Amendment rights. The City further contends that 47 U.S.C. § 555a(a) prohibits claims for monetary damages against franchising authorities in cases arising from the provision of cable services. Noting that neither the Supreme Court nor the Eleventh Circuit have resolved the issue of whether a public access cable channel is a designated·

public forum, the City contends People TV actually consists of three distinct systems which must be analyzed separately: (1) cable lines carrying programming to individual television sets; (2) cablecasting equipment that plays videotapes and carries the signals to the individual lines; and (3) the production facilities for creating videotapes. The City contends that, as the cable lines are owned by MediaOne, a private entity, and run along public property that is not a public forum, the lines are not a public forum. The City concedes for purposes of this motion that Plaintiff has a First Amendment right to access cablecast time on the equipment that plays videotapes and carries the signals to individual lines, but contends that the production facilities of People TV are not a public forum as they are depreciable hardware, not speech, and that having to show a compelling state reason for every decision regarding the hardware would paralyze management of the facility.

## LEGAL STANDARDS AND ANALYSIS

### I. *Motion to Dismiss*

"In appraising the sufficiency of the complaint ... the accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *Linder v. Portocarrero*, 963 F.2d 332 (11th Cir.1992). *See* Fed. R.Civ.P. 12(b)(6). A court accepts the facts pleaded in the complaint as true and construes them in a light favorable to plaintiff. *Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994–95 (11th Cir.1983). Under the liberal pleading requirements of the Federal Rules of Civil Procedure, a motion to dismiss will rarely be granted. *Id.* at 995. Indeed, in the Eleventh Circuit the dismissal of cases on technical grounds is disfavored preferring instead the liberal construction of

complaints. *Rubin v. O'Koren,* 621 F.2d 114, 117 (5th Cir.1980).

■ People TV contends the complaint against it should be dismissed because it is a private, non-profit corporation and therefore not subject to a complaint pursuant to 42 U.S.C. § 1983. Plaintiff has alleged, however, that People TV is an agent of the City of Atlanta. Plaintiff has alleged sufficient facts to withstand People TV's motion to dismiss.

## II. *Motions for Summary Judgment*

Courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of [the record] 'together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437–38 (11th Cir.1991).

In meeting this initial responsibility, for issues on which the moving party would bear the burden of proof at trial, the moving party must show affirmatively the absence of a genuine issue of material fact. *Four Parcels of Real Property,* 941 F.2d at 1438. For issues on which the non-moving party would bear the burden of proof at trial, the moving party may simply show that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial. *Id.*

In determining whether the moving party has met its burden, the court views the evidence in the light most favorable to the party opposing the motion. *Adickes,* 398 U.S. at 158–59, 90 S.Ct. 1598. Moreover, "[r]easonable doubts as to the facts should be resolved in favor of the nonmoving party," *Borg–Warner Acceptance Corp. v. Davis,* 804 F.2d 1580, 1582 (11th Cir.1986), "and all justifiable inferences are to be drawn in his favor," *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). The moving party's failure to meet this initial burden ends the inquiry, and summary judgment should be denied.

Once the moving party has met this initial burden, the "burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark,* 929 F.2d 604, 608 (11th Cir.1991). At this point, "the non-moving party [must] go beyond the pleadings and by affidavits of [his or her] own, or by the 'depositions[,] answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Russ v. International Paper Co.,* 943 F.2d 589, 592 (5th Cir.1991) (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). *Accord, Four Parcels of Real Property,* 941 F.2d at 1437–38. Whether facts are material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To avoid summary judgment on an issue on which the moving party would bear the burden of proof at trial, the non-moving party must come forward with evidence sufficient to call into question the moving party's evidence and any inference drawn from the evidence. *Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1116 (11th Cir.1993). For an issue on which the non-moving party would bear the burden of proof at trial and on which the moving party has provided evidence to negate the material fact, the non-moving party "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Id.* at 1116. Finally, for an issue on which the non-moving party would bear the burden

of proof at trial and on which the moving party has demonstrated an absence of evidence, the non-moving party must respond either by

> show[ing] that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was "overlooked or ignored" by the moving party, ... [or by] com[ing] forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.

*Id.* at 1116–17.

## A. *Section 1983*

"[I]n any § 1983 action the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). *See, also, Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (The first step in considering any claim under section 1983 is "to identify the specific constitutional right allegedly infringed.").

■ If the defendant in a § 1983 action is a governmental entity, the initial inquiry must focus on: "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the [governmental entity] is responsible for that violation." *Collins v. Harker Heights,* 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Section 1983 does not provide a remedy for "any and all injuries inflicted by persons acting under color of state law." *Wideman v. Shallowford Community Hosp., Inc.,* 826 F.2d 1030, 1032 (11th Cir.1987) (internal quotation marks omitted). "Absent the existence of an underlying constitutional right, no section 1983 claim will lie." *Id.*

"To act 'under color' of law does not require that the accused be an officer of the State." *Adickes,* 398 U.S. at 152, 90 S.Ct. 1598. "It is enough that he is a willful participant in joint activity with the State or its agents." *Id.* "[W]hether an instrumentality [created by the state as an independent entity] is a 'political subdivision' or 'agency' or 'department' of the state depends on the context in which the quoted terms are used." *Dept. of Human Resources v. Northeast Georgia Primary Care, Inc.,* 228 Ga.App. 130, 133, 491 S.E.2d 201 (1997), *cert. denied,* 1998.

"[A]ctions of private entities can sometimes be regarded as governmental action for constitutional purposes." *Lebron v. National Railroad Passenger Corp.,* 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). In determining that Amtrak was "an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution," the Supreme Court noted that the conclusion was "in accord with public and judicial understanding of the Government-created and -controlled corporations over the years." *Id.* at 394, 115 S.Ct. 961. "A remarkable feature of ... those corporations ... was that, even while they were praised for their status 'as agencies separate and distinct, administratively and financially and legally, from the government itself, which has facilitated their adoption of commercial methods of accounting and financing, avoidance of political controls, and utilization of regular procedures of business management,' it was fully acknowledged that they were a 'device' of 'government,' and constituted 'federal corporate agencies' apart from 'regular government departments.'" *Id.* at 394–95, 115 S.Ct. 961. "That Government-created and -controlled corporations are (for many purposes at least) part of the Government itself has a strong basis, not merely in past practice and understanding, but in reason itself." *Id.* at 397, 115 S.Ct. 961. "It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed

in the Constitution by simply resorting to the corporate form." *Id.*

Just as "Amtrak was created by a special statute, explicitly for the furtherance of federal governmental goals," *id.*, so People TV was created by the City to manage the day-to-day operations of the public access channels for which the City contracted. Just as "six of [Amtrak's] eight externally named directors ... are appointed directly by the President of the United States," *id.*, so five of People TV's directors are appointed by the Mayor and six by the City Council. Just as Amtrak was "established and organized under federal law for the very purpose of pursuing federal governmental objectives, under the direction and control of federal governmental appointees," *id.* at 398, 115 S.Ct. 961, so People TV was established and organized by the City for the purpose of pursuing City objectives under the direction and control of City appointees. "[W]here ... the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 400, 115 S.Ct. 961. In addition to the noted similarities to Amtrak, the funding for People TV is provided by the City through its contract with the cable franchisee and, in the event that the agreement with People TV is terminated for any reason, all property of People TV reverts to the City.

People TV is an agency of the City for purposes of guaranteeing constitutional rights, and a claim pursuant to § 1983 is the appropriate way to attempt to secure those rights. *See, McClellan v. Cablevision of Connecticut, Inc.,* 149 F.3d 161, 168 (2nd Cir.1998) (holding that, "if a municipality, through its local franchise authority, improperly restricts a citizen from broadcasting on a public access channel, the citizen may seek redress of such a violation in federal court under 42 U.S.C. § 1983").

### B. *Monetary Damages—Section 555a(a)*

In any court proceeding pending on or initiated after October 5, 1992, involving any claim against a franchising authority or other governmental entity, or any official, member, employee, or agent of such authority or entity, arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, shall be limited to injunctive relief and declaratory relief.

47 U.S.C. § 555a(a). The statutory language is clear. Jersawitz's action arises "from the regulation of cable service," and his recovery is therefore limited to injunctive and declaratory relief. He may not recover monetary damages from any defendant. *See, Coplin v. Fairfield Pub. Access Television,* 111 F.3d 1395, 1408 (8th Cir.1997).

### C. *Municipal Liability*

Section 1983 applies to local governments "unless the local government unit is considered part of the State for Eleventh Amendment purposes." *Monell v. Dept. of Social Services of City of New York,* 436 U.S. 658, 690 n. 54, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[A local government] can be found liable under § 1983 only where the [local government] itself causes the constitutional violation at issue." *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "Respondeat superior or vicarious liability will not attach under § 1983." *Id.* "It is only when the execution of the government's policy or custom inflicts the injury that the municipality may be held liable under § 1983." *Id.* (internal quotation marks omitted). "Thus, [the] first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id.*

▮ There is no evidence that the City itself took any action in violation of Plaintiff's constitutional rights under the First Amendment or that it had a policy or custom that permitted People TV or any People TV employee to violate Plaintiff's First Amendment rights. Further, the evidence clearly shows that the City, in the agreement with People TV, required People TV to "comply with all applicable federal, state and local laws, rules, regulations, and policies" and directed People TV to "operate public access on a nondiscriminatory and reasonable basis." The City cannot be held liable for any violation of Plaintiff's First Amendment rights.

## D.  *First Amendment*

"The First Amendment operates to protect private expression from infringement by government." *Muir v. Alabama Educational Television Com'n*, 688 F.2d 1033, 1037 (5th Cir.1982), *cert. denied*, 460 U.S. 1023, 103 S.Ct. 1274, 75 L.Ed.2d 495 (1983). "The First Amendment also prohibits government from taking certain actions which impermissibly constrict the flow of information or ideas." *Id.* at 1037–38.

▮ The person asserting that his or her conduct is protected by the First Amendment "bears the burden of showing that his conduct is expressive and that the First Amendment applies to it." *United States v. Gilbert*, 920 F.2d 878, 883 (11th Cir.1991). "The government, 'no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Id.* at 884 (quoting *Adderley v. Florida*, 385 U.S. 39, 47, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966)). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right of free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* (quoting *Cornelius v. NAACP Legal Defense and Educational Fund Inc.*, 473 U.S. 788, 799–800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). "Even when

acting in its proprietary capacity, however, the government does not enjoy absolute freedom from Fist Amendment constraints." *Id.* "The 'extent to which the government can control access depends on the nature of the relevant forum.'" *Id.* (quoting *United States v. Kokinda*, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990)).

### 1.  *First Amendment Fora*

In *Perry Education Association v. Perry Local Educators' Association*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court "identified three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum." *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439. "Traditional public fora are those places which by long tradition or by government fiat have been devoted to assembly and debate." *Id.* "In addition to traditional public fora, a public forum may be created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." *Id.* "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Id.* "Accordingly, the Court has looked to the policy and practice of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Id.*

"Because a principal purpose of traditional public fora is the free exchange of ideas, speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Id.* at 800, 105 S.Ct. 3439. "Similarly, when the Government has intentionally designated a place or means of communication as a public forum speakers cannot be excluded without a compelling governmental interest."

*Id.* "The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communications." *Perry Ed. Ass'n,* 460 U.S. at 45, 103 S.Ct. 948.

"[U]nlike traditional public forums the dedication of a designated public forum to the public can be revoked and its subject-matter can be limited in accordance with the character of the forum." *Chicago Acorn v. Metropolitan Pier and Exposition Authority,* 150 F.3d 695, 699–700 (7th Cir.1998). "Whenever the government is in the business of speech, whether it is producing television programs or operating a museum or making grants or running schools, the exercise of editorial judgment is inescapable. If there is any political or ideological resonance to the expressive activity involved, the good-faith exercise of that judgment may have unavoidable political or ideological consequences; and so (because they are unavoidable) these consequences do not condemn the judgment." *Id.* at 701. "A publicly owned art gallery, which has to decide which pictures to hang where, is not constitutionally debarred from placing the most offensive pictures in the least conspicuous exhibition area." *Id.*

"Not every instrumentality used for communication, however, is a traditional public forum or a public forum by designation." *Cornelius,* 473 U.S. at 803, 105 S.Ct. 3439. "The First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Id.* The Supreme Court has drawn a distinction between " 'general access' which indicates the property is a designated public forum" and " 'selective access' which indicates the property is a nonpublic forum." *Arkansas Educational Television Commission v. Forbes,* 523 U.S. 666, 118 S.Ct. 1633, 1642, 140 L.Ed.2d 875 (1998). "On one hand, the government creates a designated public forum when it makes its property generally available to a certain class of speakers." *Id.* "On the other hand, the government does not create a designated public forum when it does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, 'obtain permission' to use it." *Id.* "[N]onpublic forum status 'does not mean that the government can restrict speech in whatever way it likes.' " *Id.* at 1643 (quoting *International Soc. For Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 687, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992)). "To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." *Id.*

"Although a speaker may be excluded from a nonpublic forum if he ... is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." *Cornelius,* 473 U.S. at 806, 105 S.Ct. 3439. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation." *Id.* at 808, 105 S.Ct. 3439 (emphasis in original). "Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling." *Id.* at 809, 105 S.Ct. 3439. "The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Id.* "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Id.* "The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination." *Id.* at 811, 105 S.Ct. 3439.

## 2. *Public Access Cablecasting*

■ "Congress's purpose in enacting the [Cable Communications Policy Act (CCPA), 47 U.S.C. §§ 521–573] was to 'establish a national policy that clarifies the current system of local state, and Federal regulation of cable television.'" *McClellan v. Cablevision of Connecticut, Inc.*, 149 F.3d 161, 168 (2nd Cir.1998) (quoting H.R.Rep. No. 98–934, at 19, 1984 U.S.C.C.A.N. at 4656). "[T]he CCPA permits a locally accountable body, typically the local franchising authority, to control the operation of public access channels." *Id.* (citing 47 U.S.C. § 531(c)). "However, a local franchising authority may avoid liability in its exercise of editorial control of public access channel content only to the extent that it exercises such control within First Amendment boundaries." *Id.* "Neither [*Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) ] nor the language of the CCPA indicates that Congress intended to permit cable operators to exercise broad editorial control over public access channels." *Id.* "Although the CCPA permits locally accountable authorities to enforce the franchise agreements and control the operation of public access channels, the CCPA also 'contains provisions to assure that cable systems provide the widest possible diversity of information services and sources to the public, consistent with the First Amendment's goal of a robust marketplace of ideas.'" *Id.* (quoting H.R.Rep. No. 98–934, at 19, 1984 U.S.C.C.A.N. at 4656). "In addition, if a municipality, through its local franchise authority, improperly restricts a citizen from broadcasting on a public access channel, the citizen may seek redress of such a violation in federal court under 42 U.S.C. § 1983." *Id.* (citing *Coplin v. Fairfield Pub. Access Television*, 111 F.3d 1395, 1398 (8th Cir.1997)).

"[T]he degree of control that a public broadcast licensee can exercise over its broadcast programming consistent with the First Amendment depends on the mission of the communicative activity being controlled." *Chandler v. Georgia Public Telecommunications Com'n*, 917 F.2d 486, 488 (11th Cir.1990) (citing *Schneider v. Indian River Community College Found., Inc.*, 875 F.2d 1537, 1541 (11th Cir.1989)), *cert. denied*, 502 U.S. 816, 112 S.Ct. 71, 116 L.Ed.2d 45 (1991). "Public, educational, or governmental channels (which we shall call public access channels) are channels that, over the years, local governments have required cable system operators to set aside for public, educational, or governmental purposes as part of the consideration an operator gives in return for permission to install cables under city streets and to use public rights-of-way." *Denver Area Educ.*, 518 U.S. at 734, 116 S.Ct. 2374 (plurality opinion) (citing 47 U.S.C. § 531) (internal quotation marks omitted). Because of "the changes taking place in the law, the technology, and the industrial structure related to telecommunications," the Supreme Court in *Denver Area Educ.* declined to determine the extent to which a public access cable television channel "available to any resident" can be designated a public forum. *Id.* at 742, 116 S.Ct. 2374.

## 3. *Analysis*

■ First Amendment law and the evidence support Plaintiff's contention that People TV's cablecasting facilities are a designated public forum, available to anyone whose videotape meets the technical and content requirements established by People TV and the City—not selling any commercial products or services; not containing advertising or other information about any lottery, gift enterprise, or similar scheme offering prizes; not containing any direct or indirect solicitation of funds; not containing obscene, indecent, or defamatory material; and not containing material that would violate any federal or state law. By barring Plaintiff from its production facilities, however, People TV did not bar Plaintiff from submitting videotapes to be cablecast and therefore did not violate his First Amendment right to use the cablecasting facilities. In addition, People TV may constitutionally use its ad-

ministrative and editorial judgment in placing Plaintiff's videotapes in an appropriate time slot. *See Chicago Acorn,* 150 F.3d at 701.

■ First Amendment law and the evidence support the City's contention that People TV's production facilities and equipment are not a designated public forum, but are, instead, a nonpublic forum. People TV limits access to the production facilities and equipment to producers who met certain qualification requirements and who agreed to comply with the rules and regulations established by People TV. Each producer must individually apply for permission to use the production facilities and equipment. *See, Arkansas Educational Television Com'n,* 118 S.Ct. at 1642.

People TV may constitutionally bar Plaintiff from using its facilities and equipment for violating its rules of usage as long as those rules are reasonable. As the evidence before the Court fails to show which rules and regulations Plaintiff is alleged to have violated, or the reasons for those rules and regulations, it is impossible for the Court to determine if People TV violated Plaintiff's First Amendment rights.

## CONCLUSION

Finding oral argument to be unnecessary, the Court DENIES Plaintiff's request for oral argument [44–1]. The Court GRANTS Plaintiff's unopposed request to accept his late response [55–1] and the City's unopposed motion to accept its motion for summary judgment out of time [51–2]. For the reasons stated above, the Court DENIES People TV's motion to dismiss [41–1], GRANTS the City's motion for summary judgment [51–1], DENIES Plaintiff's motion for summary judgment [47–1], and GRANTS People TV's motion for summary judgment as to Plaintiff's claim for monetary damages but DENIES it as to Plaintiff's claim for injunctive relief [41–2].

If People TV or Plaintiff want to file motions for summary judgment with sup-porting evidence as to the constitutionality of People TV's rules and regulations and Plaintiff's being barred for allegedly violating those rules and regulations, the Court will permit them to be filed by May 3, 1999. If no motions are filed, the Pretrial Order is due on May 3, 1999.

## *ORDER*

Plaintiff Jack Jersawitz, a public access television producer, filed this section 1983 case against Defendants, People TV, Inc., the People TV Board of Directors and various employees and former employees of People TV (hereinafter collectively People TV), and the City of Atlanta and Bill Campbell, Mayor (hereinafter collectively City of Atlanta or City), alleging People TV and the City of Atlanta violated his First Amendment rights by barring his access to the People TV facilities and equipment. In an order dated March 30, 1999, the Court denied People TV's motion to dismiss, granted the City's motion for summary judgment, granted People TV's motion for summary judgment as to monetary damages, but denied People TV's motion for summary judgment as to injunctive relief. The Court also gave both People TV and Plaintiff permission to submit motions for summary judgment as to the constitutionality of People TV's rules and regulations and Plaintiff's alleged violation of those rules and regulations. The case is before the Court on Plaintiff's motion for reconsideration, People TV's motion to dismiss or, in the alternative, for summary judgment, Plaintiff's motion to compel, and Plaintiff's request for permission to file an untimely response to People TV's motion for summary judgment. Plaintiff's unopposed request to file an untimely response is granted. People TV has shown the Court that it made available to Plaintiff the information requested in his motion to compel. The Court therefore denies Plaintiff's motion to compel as moot. As People TV has included evidence outside the complaint in its motion, the Court denies the motion to dismiss but

will consider the motion for summary judgment on its merits. For the reasons stated herein, the Court denies Plaintiff's motion for reconsideration and grants People TV's motion for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case were set out in detail in the March 30, 1999 Order and will not be repeated here. The facts relevant to the motion currently before the Court are summarized below.

Plaintiff acknowledged that he had seen a copy of the People TV Producer's Handbook, which contains the rules and regulations applicable to users of the People TV facilities. The Handbook establishes certain qualifying requirements for use of the facilities and equipment and specifies that a producer "has the right of controlling the content of a program" but also details certain responsibilities of a producer, one of which is to abide by the rules and regulations. In an Overview of Rules and Regulations, the Handbook states that "[i]t is necessary that each producer be respectful of all other producers and staff." The Handbook further states: "[E]veryone coming into the facility must respect all the other diverse Producers, crews, guests, talent, and various others who will be in our facilities. In addition to this respectful attitude, you are expected to know and abide by all of the rules and regulations of People TV." In stating sanctions for violations of the rules and regulations, the Handbook specifies that all use of the facilities including production and playback may be terminated, suspended, or limited. An appeals procedure is provided for all sanctions.

In January 1996, Plaintiff was sent a criminal trespass warning by Ronald Freeman, the attorney for People TV. In a fax dated January 29, 1996, Plaintiff referred to the criminal trespass warning as "a shameful abuse of the law" and referred to Norman Davis, a member of the People TV Board, as "little more than a gutless fascist." In a letter to Freeman dated January 31, 1996, Plaintiff stated that the criminal trespass warning "doesn't amount to a hill of beans" and threatened "lots of trouble" for Freeman and Davis and Chris Leonard, former general manager of People TV, if they attempted to enforce the warning. Plaintiff further referred to Davis and Leonard as liars.

In an October 10, 1996 letter to Donna Fowler, general manager of People TV, Plaintiff referred to Fowler as a liar; to Gary Bastian, chairman of the People TV Board, as a fascist; to Fowler, Bastian, and Leonard as having a "petit bourgeois social make-up"; and to Richard Van Slyke, a People TV producer, as an opportunist. In a letter dated November 14, 1996, Plaintiff called Valencia Goodman, director of programming for People TV, "stupid and ignorant," an opportunist, a conformist, and a fascist. He referred to Fowler and Bastian as liars, to Bastian as a fascist, and to most of the members of the Board as opportunists. In a memo to Fowler dated November 18, 1996, Valencia Goodman described Plaintiff's abusive behavior in a November 15, 1996 telephone conversation.

In a January 28, 1997 fax to Bastian Plaintiff referred to Freeman as a "crooked lying attorney," called Donna Fowler "a simple liar," and suggested that all members of the People TV Board and management were crooks and liars.

On January 30, 1997, when Plaintiff arrived to use the facilities of People TV, he was handed a letter informing him that he was no longer welcome at People TV and that he would be arrested for criminal trespass if he entered the land or premises for any reason. He was further informed that if he did not cease harassing representatives and staff of People TV with telephone calls, faxes, and other communications, a warrant would be taken out for his arrest. Plaintiff refused to leave the property and was arrested for criminal trespass.

On February 4, 1997, Plaintiff, acting pro se, filed this case alleging numerous

violations of various rights by People TV and the City of Atlanta, but later abandoned all except claims relating to his alleged First Amendment right to be on the premises of People TV and to use the facilities and equipment of People TV as he wishes without interference.

In the March 30, 1999 Order, this Court found that People TV was an agency of the City for purposes of guaranteeing constitutional rights and that a claim pursuant to § 1983 was the appropriate way to attempt to secure those rights; that the action arose from the regulation of cable service and that Plaintiff was therefore limited to injunctive and declaratory relief; that there was no evidence the City violated Plaintiff's constitutional rights; that People TV's cablecasting facilities are a designated public forum but that Plaintiff had not been barred from submitting tapes to be cablecast and his First Amendment right to use the cablecasting facilities had not been violated; and that People TV's production facilities and equipment are a nonpublic forum and access to those facilities may be limited by reasonable rules and regulations. The record before the Court at that time did not include allegations of which rules Plaintiff had violated or evidence of the alleged violations. The Court granted both Plaintiff and People TV permission to file additional motions for summary judgment.

## LEGAL STANDARDS AND ANALYSIS

### I. *Motion to Reconsider*

■ Motions for reconsideration should be filed only when "absolutely necessary." LR 220–6, NDGa. Reconsideration may be necessary if there is (1) newly discovered evidence, (2) an intervening development or change in controlling law, or (3) the need to correct a clear error or prevent manifest injustice. *Preserve Endangered Areas v. United States Army Corps of Engineers,* 916 F.Supp. 1557, 1560 (N.D.Ga.1995), *aff'd,* 87 F.3d 1242 (11th Cir.1996). "A motion for reconsideration is not an opportunity for the moving party ... to instruct the court on how the court 'could have done it better' the first time." *Id.*

Plaintiff has presented no newly discovered evidence; nor has he cited to an intervening development or change in controlling law; nor has he shown the need to correct a clear error or prevent manifest injustice. Plaintiff has shown no reason why the March 30, 1999 order should be reconsidered.

### II. *Motion for Summary Judgment*

Courts should grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial responsibility of informing the ... court of the basis for its motion, and identifying those portions of (the record) 'together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437–38 (11th Cir.1991).

Once the moving party has met this initial burden, the "burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark,* 929 F.2d 604, 608 (11th Cir.1991). At this point, "the non-moving party [must] go beyond the pleadings and by affidavits of [his or her] own, or by 'depositions[,] answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Russ v. International Paper Co.,* 943 F.2d 589, 592 (5th Cir.1991) (quoting *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548).

The person asserting First Amendment protections "bears the burden of showing that his conduct is expressive and that the First Amendment applies to it." *United*

*States v. Gilbert,* 920 F.2d 878, 883 (11th Cir.1991). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right of free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* (quoting *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 799–800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)).

"The Government's decision to restrict access to a nonpublic forum need only be *reasonable;* it need not be the most reasonable or the only reasonable limitation." *Cornelius,* 473 U.S. at 808, 105 S.Ct. 3439 (emphasis in original). "Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling." *Id.* at 809, 105 S.Ct. 3439. "The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Id.* "The reasonableness of the Government's restriction of access to a nonpublic forum must be assessed in the light of the purpose of the forum and all the surrounding circumstances." *Id.* "The existence of reasonable grounds for limiting access to a nonpublic forum, however, will not save a regulation that is in reality a facade for viewpoint-based discrimination." *Id.* at 811, 105 S.Ct. 3439. "To be consistent with the First Amendment, the exclusion of a speaker from a nonpublic forum must not be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property." *Arkansas Educational Television Commission v. Forbes,* 523 U.S. 666, 682, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998).

■ Maintaining peace in the workplace of a governmental agency is a legitimate interest which may justify limitations on a person's speech. *See Cornelius,* 473 U.S. at 809–10, 105 S.Ct. 3439. A governmental agency "need not wait until havoc is wreaked to restrict access to a nonpublic forum." *Id.* at 810, 105 S.Ct. 3439.

People TV contends its rule requiring that users of its production facilities be respectful of others is designed to maintain peace at the People TV facilities and is therefore reasonable. People TV further contends Plaintiff violated this rule by continually harassing People TV employees over the telephone, by fax, and by mail.

Plaintiff contends the cases cited by People TV, *Cornelius, Forbes,* and *International Soc. For Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992), are inapplicable because none of them address First Amendment rights within the context of a public access cable provider. Plaintiff further contends some of the evidence presented by People TV is too old to be considered and that the Court should, instead, focus on more recent events. Plaintiff does not deny that he made the telephone calls and sent the letters and faxes to which People TV objects but contends they threaten only lawful activities, i.e. lawsuits, picket lines, "and similar activities." Finally, Plaintiff contends, in an attached affidavit, that he has consistently offered his assistance to other People TV certified producers when asked.

■ The rules and regulations at issue here, those requiring that every producer be respectful of all others at the People TV production facility, are reasonably designed to create a peaceful workplace and are viewpoint neutral. The evidence before the Court shows that Plaintiff violated those rules and regulations numerous times during 1996 and early in 1997: his letters, telephone calls, and faxes show a complete lack of respect toward various employees of the People TV production facility. Plaintiff was warned early in 1996 that his behavior was unacceptable. People TV's action in barring Plaintiff from the production facility was reasonable under the circumstances and did not violate Plaintiff's First Amendment rights. Peo-

ple TV is entitled to summary judgment on Plaintiff's claims.

### CONCLUSION

Plaintiff's unopposed request to accept his untimely response to People TV's motion [69–1] is GRANTED. Plaintiff's motion to compel [62–1] is DENIED as moot. People TV's motion to dismiss [61–1] is DENIED because evidence outside the complaint was submitted and considered. For the reasons stated herein, the Court DENIES Plaintiff's motion for reconsideration [60–1] and GRANTS People TV's motion for summary judgment [61–2].

**Clerk of Court** is directed to enter judgment for Defendants. This closes the case.