Justice Breyer,
with whom Justice Stevens, joins, dissenting.
Unlike the Court, I believe the District Court’s remand order is reviewable on appeal. And, reviewing the decision below, I would hold that Powerex is an organ of the Government of British Columbia.
I
The majority concludes that 28 U. S. C. § 1447(d) took from the Ninth Circuit the power to review the District Court’s *240 remand decision. The statutory argument is a strong one. Section 1447(c) says that, “[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded” to state court; and § 1447(d), referring to subsection (c), adds that a district court “order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise.” Thermtron Products, Inc. v. Hermansdorfer, 423 U. S. 336, 345-346 (1976).
Nonetheless this Court has found exceptions to §1447’s seemingly blanket prohibition. See, e.g., id., at 350-352; Osborn v. Haley, 549 U. S. 225, 240-244 (2007). In doing so, the Court has recognized that even a statute silent on the subject can create an important conflict with § 1447(d)’s “no appellate review” instruction. And where that is so, we have, in fact, resolved the conflict by reading a later more specific statute as creating an implicit exception to § 1447(d) (though Osborn did not say as much). Id., at 243-244.
The subject matter of the Foreign Sovereign Immunity Act of 1976’s (FSIA) removal provision, foreign sovereigns, is special. And the FSIA creates serious conflicts with § 1447(d)’s “no appellate review” instruction. The FSIA is later enacted and subject-matter specific. Consequently, I would read into the FSIA a similar exception to § 1447(d), applicable here.
Osborn illustrates my starting point: a conflict with § 1447(d). The Westfall Act, the specific statute at issue in that case, provides for removal to federal court of a state-court lawsuit brought against a federal employee where the state-court lawsuit attacks employee actions within the scope of federal employment. 28 U. S. C. §§2679(d)(2)-(3). The Westfall Act authorizes the Attorney General to certify that the employee’s actions at issue fall within the scope of federal employment. And the Westfall Act says that the certification “conclusively establishes] ” that fact for removal purposes. §§2679(d)(l)-(2). In Osborn, we pointed out *241 that § 1447(d) would permit a district court, without appellate review, to remand in the face of a contrary Attorney General certification. 549 U. S., at 242. Doing so, without appellate review, would thereby permit the district court to substitute its own judgment (as to whether the employee’s actions were within the federal “scope of employment”) for that of the Attorney General. And the district court would thereby have the unreviewable power to make the Attorney General’s determination wow-conclusive, contrary to what the statute says. Because § 1447(d), if applied, would render this statutory instruction “weightless,” we found a conflict with § 1447(d). Ibid. And we resolved the conflict in favor of the later enacted, more specific Westfall Act. Id., at 243.
A similarly strong conflict exists here, albeit not with a separate removal provision, but rather with a comprehensive statutory scheme. To understand how that is so, imagine a case not now before us. Imagine that a private plaintiff brings a lawsuit in state court against a noncommercial division of a foreign nation’s government, say, a branch of that nation’s defense ministry or, for that matter, against the foreign nation itself. The FSIA provides a specific guarantee that such a suit cannot continue (except in certain instances that, for purposes of my example, are not relevant). 28 U. S. C. §§ 1602-1605. It achieves this objective by authorizing the foreign government to remove the case to federal court where a federal judge will determine if the defendant is indeed a foreign government and, if so, dismiss the case. § 1441(d).
What happens if the foreign sovereign removes the case to federal court only to have the federal judge mistakenly remand the case to state court? As in an ordinary case, the lawsuit may well continue in the state tribunal. But, if so, unlike the ordinary case (say, a wrongly remanded diversity or “arising under” case) but like Osborn, the removing party will have lost considerably more than a choice of forum. The removing party will have lost that which a different *242 portion of the special statute sought to provide, namely, the immunity from suit that the FSIA sought to ensure.
That assurance forms a separate and central FSIA objective. The very purpose of sovereign immunity is to avoid subjecting a foreign sovereign to the rigors and “inconvenience of suit.” Dole Food Co. v. Patrickson, 538 U. S. 468, 479 (2003). In such a case, a state court likely will feel bound by the federal court’s prior judgment on the lack of immunity (under state law-of-the-ease doctrine) and this Court’s review (of an adverse state-court judgment) will come too late. In such a case, the FSIA’s basic objective (unrelated to choice of forum) will have become “weightless.” Osborn, supra, at 242.
It is difficult to see how this conflict between the FSIA’s basic objective and § 1447(d) is any less serious than the conflict at issue in Osborn. The statutory objective here, harmonious relations with foreign sovereigns, is more, not less, important. See Ex parte Peru, 318 U. S. 578, 587 (1943) (exercising original writ to protect sovereign from erroneous District Court conclusion that it was not immune from suit). See also, e. g., Republic of Mexico v. Hoffman, 324 U. S. 30, 35 (1945); Schooner Exchange v. McFaddon, 7 Cranch 116 (1812); H. R. Rep. No. 94-1487, p. 13 (1976) (hereinafter H. R. Rep.) (FSIA intended to avoid “adverse foreign relations consequences”).
Neither is a § 1447(d) exception here likely to undermine § 1447(d)’s basic purpose: avoiding the procedural delay that an added federal appeal would create. Avoiding that delay is important in a typical case where only choice of forum is at issue. But that same delay is necessary, indeed, crucial, in the special case where a foreign sovereign’s immunity from suit is at issue. At the same time, foreign affairs is itself an exceptional topic, with special risks, special expertise, and special federal authority; hence, our finding a § 1447(d) exception in the FSIA is unlikely to lead courts to create a series of exceptions affecting more typical cases. *243 See, e. g., Kircher v. Putnam Funds Trust, 547 U. S. 633, 640-641 (2006) (avoidance of delay is § 1447(d)’s basic purpose).
Finally, as in Osborn, the FSIA is a specific, later enacted statute. Cf. 549 U. S., at 243; see generally Long Island Care at Home, Ltd. v. Coke, ante, at 170 (where statutory provisions are inconsistent, “normally the specific governs the general”); Morales v. Trans World Airlines, Inc., 504 U. S. 374, 384-385 (1992); Simpson v. United States, 435 U. S. 6, 15 (1978).
Taken together, these considerations lead me to believe that, were a foreign wow-commercial government entity’s immunity from suit at issue, the FSIA would conflict with § 1447(d), leading a court properly to read the FSIA as implicitly creating an exception to § 1447(d), and thereby protecting the sovereign’s right to appeal a wrongful remand order.
The removing defendant in this case, of course, is not a foreign sovereign immune from suit. It is a foreign governmental entity that acts in a commercial capacity and consequently is subject to suit. 28 U. S. C. § 1605(a)(2). But the FSIA nonetheless creates an important, though different, conflict. That conflict arises because a different FSIA provision says, “[u]pon removal the action shall be tried by the court without jury.” § 1441(d) (emphasis added); see H. R. Rep., at 33 (“[Q]ne effect of removing an action under the new section 1441(d) will be to extinguish a demand for a jury trial made in the state court”); S. Rep. No. 94-1310, p. 32 (1976) (hereinafter S. Rep.) (same). A wrongful remand would destroy this statutory right. The state-court trial would often proceed with a jury; and it is questionable whether even this Court could later set aside an adverse state-court judgment for that reason — at least Congress seems to have thought as much. See H. R. Rep., at 33 (“Because the judicial power of the United States specifically encompasses actions between a State, or the Citizens thereof, *244 and foreign States, this preemption of State court [jury trial] procedures in cases involving foreign sovereigns is clearly constitutional” (emphasis added; citations and internal quotation marks omitted)); S. Rep., at 32 (same).
The conflict is important, this case is special, and we should resolve it by reading the FSIA as implicitly preempting the general application of § 1447(d). Indeed, I do not see how we could read the FSIA differently in this respect depending upon whether commercial or noncommercial sovereign activity is at issue. For these reasons, I believe that the Ninth Circuit correctly determined that it possessed legal authority to review the case.
It is true, as the majority states, that Congress has in other contexts carved out certain removal orders as being specifically reviewable on appeal. Ante, at 237. The majority reads these specific statutes to suggest that had Congress intended § 1447(d) not to apply in FSIA cases, it could simply have said so. Ibid. However, in fact, for the reasons articulated above, I believe that Congress must have assumed the FSIA overrode § 1447. Congress enacted the FSIA soon after the Court’s decision in Thermtron Products, 423 U. S., at 345, held that implicit § 1447(d) exceptions might exist. Cf. Osborn, 549 U. S., at 241-243 (despite statutory silence, reading Westfall Act as overriding § 1447(d)). And, as I have said, the FSIA would otherwise fail to achieve Congress’ basic objectives. Context and purpose make clear that few if any Members of Congress could have wanted to block appellate review here. Were the Court to pay greater attention to statutory objectives and purposes and less attention to a technical parsing of language, it might agree. Were it to agree, we would exercise our interpretive obligation, not “lawmaking power,” ante, at 238, n. 5, with increased fidelity to the intention of those to whom our Constitution delegates that lawmaking power, namely, the Congress of the United States. And, law in this democracy would be all the better for it.
*245 II
I part company with the Ninth Circuit on the merits. The Circuit held that the District Court’s remand was proper because, in its view, Powerex is not “an organ of a... political subdivision” of a “foreign state.” 28 U. S. C. § 1603(b)(2) (emphasis added). Hence, it is not an “agency or instrumentality” of a foreign government and falls outside the scope of the FSIA’s provision authorizing removal. § 1603(a); see generally California v. NRG Energy Inc., 391 F. 3d 1011, 1025-1026 (2004).
In my view, however, Powerex is “an organ” of the Province of British Columbia, a “political subdivision” of Canada. The record makes clear that Powerex is a government-owned and government-operated electric power distribution company, not meaningfully different from ordinary municipal electricity distributors, the Tennessee Valley Authority, or any foreign “nationalized” power producers and distributors, such as Britain’s former Central Electricity Generating Board or Electrieité de France. See generally C. Harris, Electricity Markets: Pricing, Structures, and Economics 15-20 (2006) (summarizing features of electricity companies in United States and Europe, among others); J. Nelson, Marginal Cost Pricing in Practice 3-6,32,37 (1964) (summarizing features of France hydropower industry). See also http:// tva.com/abouttva/index.htm (summarizing general features of Tennessee Valley Authority) (all Internet materials as visited June 8, 2007, and available in Clerk of Court’s case file); Government Corporation Control Act, § 101,59 Stat. 597-598 (describing Tennessee Valley Authority as “‘wholly owned Government corporation’”); Lebrón v. National Railroad Passenger Corporation, 513 U. S. 374,388-389 (1995) (noting that corporate entities in Government Corporation Control Act were incorporated by other government-owned corporations); Dept, of Labor, Bureau of Labor Statistics, Career Guide to Industries, Utilities, online at http://www.bls.gov/ oco/cg/cgs018.htm (describing features of public run utilities); *246 G. Rothwell & T. Gómez, Electricity Economics: Regulation and Deregulation 129-241 (2003) (comparing electricity markets and industries in California and various foreign nations).
Powerex is itself owned and operated by BC Hydro, an entity that all apparently concede is governmental in nature. Brief for Plaintiffs-Respondents 38-40, 42. British Columbia's statutes create BC Hydro as a kind of government agency to produce water-generated electric power. Power Measures Act, S. B. C., ch. 40 (1964); App. to Pet. for Cert. 52a, 118a, 163a-169a. BC Hydro has a board of directors, all of whom are appointed by British Columbia's government. Id., at 58a-59a. It is an “agent of the [provincial] government and its powers may be exercised only as an agent of the government.” Hydro Power Authority Act, R. S. B. C., ch. 212, § 3(1) (1996). The District Court concluded that BC Hydro is, in fact, a foreign sovereign entity entitled to immunity. 391 F. 3d, at 1024.
British Columbia’s Minister of Energy issued a written directive ordering that BC Hydro create a subsidiary, Powerex, to carry out the specialized tasks of exporting hydro-generated electric power and of importing power, which it is then to distribute to British Columbia residents. App. 235-239,250-251,267. Powerex specifically carries out these obligations in accordance with various treaties between Canada and the United States. Id., at 133-155; App. to Pet. for Cert. 55a; see Treaty Between the United States of America and Canada Relating to Cooperative Development of the Water Resources of the Columbia River Basin, Jan. 17,1961, [1964] 15 U. S. T. 1555, T. I. A. S. No. 5638, App. to Pet. for Cert. 61a-82a; Treaty Between Canada and the United States of America Relating to the Skagit River and Ross Lake, and the Seven Mile Reservoir on the Pend d’Oreille River, Apr. 2, 1984, 1469 U. N. T. S. 309, T. I. A. S. No. 11088, App. to *247 Pet. for Cert. 138a-145a; British Columbia-Seattle Agreement (Mar. 30,1984), App. 160-171.
Powerex’s board members consist of some of BC Hydro’s board members and other members whom those members appoint. App. 233-235. The government’s comptroller general reviews Powerex’s financial operations and regulates the terms under which it conducts business. Financial Administration Act, R. S. B. C., ch. 138, §§4.1, 8(2)(c)(i), 75, 79.3 (1996) (FAA), Addendum to Brief for Petitioner 34-36,40-42 (hereinafter Addendum). British Columbia’s fiscal control statute refers to Powerex as a “ ‘government body.’ ” FAA §1, Addendum 31, 33. And other British Columbia laws refer to its employees as “‘public office holders.’” Lobbyists Registration Act, S. B. C., ch. 42, § 1 (2001), Addendum 50. Powerex pays no income taxes. See Income Tax Amendments Act, 1997, S. C. 1998, ch. 19, §178 (to be codified at R. S. C., ch. 1, §§ 149(l)(tZ), (d.2), Addendum 45; App. to Pet. for Cert. 58a; Brief for Petitioner 31. The British Columbian government, through BC Hydro, has sole beneficial ownership and control of Powerex. App. 267. If Powerex earns a profit, that profit must be rebated directly or indirectly to British Columbia’s residents. Id., at 215, 238. I can find no significant difference between Powerex and the classical government entities to which I previously referred. Supra, at 245.
The Ninth Circuit noted that Powerex may earn a profit and that the government of British Columbia does not provide financial support. And the Ninth Circuit thought these facts made a critical difference. But a well-run nationalized firm should make a reasonable profit; nor should it have to borrow from the government itself. See, e. g., Nelson, supra, at 8-12; Harris, supra, at 125, 130-132; Rothwell & Gómez, supra, at 3-4. The relevant question is not whether Powerex earns a profit but where does that profit go? Here it does not go to private shareholders; it goes to the benefit *248 of the public in payments to the province and reduced electricity prices. App. 215, 238.
The Ninth Circuit also pointed out that certain provincial regulations that apply to other governmental departments do not apply to Powerex. That fact proves little. The Tennessee Valley Authority, which is “perhaps the best known of the American public corporations,” First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba, 462 U. S. 611, 625, n. 15 (1983), is not subject to certain federal regulations regarding hiring that apply to other governmental departments. See, e. g., 16 U. S. C. § 831b.
In sum, Powerex is the kind of government entity that Congress had in mind when it wrote the FSIA’s “commercial activit[y]” provisions. See generally 28 U. S. C. § 1602 et seq.; H. R. Rep., at 15; S. Rep., at 14; Banco, supra, at 624-625.
For these reasons, I believe we should consider, and reverse, the Ninth Circuit’s determination. With respect, I dissent.